ESTATE OF SAMUEL I. NEWHOUSE, DECEASED, SAMUEL I. NEWHOUSE, JR. AND DONALD E. NEWHOUSE, EXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23588-83.        Filed February 28, 1990.

*Albert H. Turkus, Judith A. Mather, James A. Treaner III, Bernard J. Long, Jr., Linda A. Fritts,* and *Richard L. Braunstein,* for the petitioners.

*Robert S. Shilliday, Jr., Albert L. Sandlin,* and *Howard P. Levine,* for the respondent.

WILLIAMS, *Judge:* The Commissioner determined a deficiency in the Federal estate tax due from the estate of Samuel I. Newhouse in the amount of $609,519,855. The Commissioner also determined an addition to tax for fraud pursuant to section 6653(b)[1] in the amount of $304,759,927. The Commissioner has conceded the addition to tax for fraud.

After concessions, the remaining issues for our decision are: (1) The value, for purposes of the Federal estate tax, of 10 shares of class A common stock and 990 shares of class B common stock of Advance Publications, Inc., owned by Samuel I. Newhouse, Sr. (Newhouse) at the time of his

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect at decedent's death.

death, and (2) the value, for purposes of the Federal estate tax, of 100 shares of common stock in Newhouse Broadcasting Co. owned by Newhouse at the time of his death.

### FINDINGS OF FACT

Some of the facts were stipulated and are so found. Newhouse died testate on August 29, 1979. His sons, S.I. Newhouse, Jr. (S.I., Jr.), and Donald E. Newhouse (Donald), were duly appointed executors of his estate. At the time of his death, Newhouse resided in Palm Beach, Florida. The executors timely filed a Federal estate tax return on May 27, 1980, and elected to value the Newhouse estate as of February 29, 1980, the alternate valuation date.

On Schedule B of the estate tax return, the executors valued the 10 shares of class A common stock and the 990 shares of class B common stock in Advance Publications, Inc. (Advance), at $8,595,000 and $170,181,000, respectively, based on an appraisal by Chemical Bank. Also on Schedule B of the estate tax return, the executors valued the 100 shares of common stock in Newhouse Broadcasting Co. (N.B. Co.) at $68,300,000. In the notice of deficiency dated May 18, 1983, the Commissioner valued the 10 shares class A common stock and the 990 shares of class B common stock in Advance at $420,000,000 and $811,800,000, respectively, and valued the 100 shares of common stock in N.B. Co. at $91,600,000. On August 12, 1983, petitioners timely filed their petition in this case.

### I. VALUE OF ADVANCE COMMON STOCK

A. *Organization and Operations*

Advance is a corporation organized under the laws of the State of New York that publishes newspapers and magazines. Advance's principal place of business was and always has been in New York. At the time of Newhouse's death, the officers of Advance were: Newhouse, President and Treasurer; Mitzi Newhouse, Newhouse's wife, Vice President; S.I., Jr., Vice President; Donald, Secretary.

In 1922, Newhouse and Judge Hyman Lazarus, a New Jersey lawyer, formed a partnership to acquire 51 percent of the stock of the Staten Island Advance which published a

newspaper, The Staten Island Advance. In 1924, Newhouse bought Judge Lazarus' shares and soon after purchased the remaining 49 percent. Newhouse filed a Certificate of Incorporation (the certificate) for the Staten Island Advance Co., Advance's predecessor, on May 12, 1924. From the time Newhouse incorporated Advance, Newhouse's brothers Theodore (Ted) and Norman were employed at Advance, and all three brothers shared equally in the management of the business.

In 1932, Advance acquired the controlling interest in the Long Island Daily Press Publishing Co., the first of a long line of newspaper acquisitions. In 1939, Advance bought two newspaper properties in Syracuse, New York. Advance further enlarged its operations by purchasing an Oregon newspaper in 1950 and newspapers in Alabama in 1956. On February 29, 1980, Advance operated either by itself or through a wholly owned subsidiary, 50 newspapers in 22 markets as well as magazines published by Conde Nast Publications, Inc. (Conde Nast).[2] After each acquisition one of the brothers was assigned primary responsibility for the acquired property and assumed management of its opera-

---

[2]As of Feb. 29, 1980, Advance owned and operated the following newspapers: The Staten Island Advance in New York, New York; the National News Service Co. in Washington, D.C.; The Birmingham News in Birmingham, Alabama; The Huntsville News and The Huntsville Times in Huntsville, Alabama; The Jersey Journal in Jersey City, New Jersey; The Post-Standard, The Syracuse Herald-Journal, and the Syracuse Herald-American in Syracuse, New York; The St. Louis Globe in St. Louis, Missouri; The Ann Arbor News in Ann Arbor, Michigan; The Bay City Times in Bay City, Michigan; The Flint Journal in Flint, Michigan; The Grand Rapids Press in Grand Rapids, Michigan; The Jackson Citizen Patriot in Jackson, Michigan; The Kalamazoo Gazette in Kalamazoo, Michigan; The Muskegon Chronicle in Muskegon, Michigan; The Saginaw News in Saginaw, Michigan; The Mississippi Press and The Mississippi Press Register in Pascagoula, Mississippi; The Mobile Register, The Mobile Press, and The Press-Register in Mobile, Alabama; The Star-Ledger in Newark, New Jersey; The Oregonian and the Oregon Journal in Portland, Oregon; Parade in New York, New York; The Patriot, The Evening News, and the Sunday Patriot News in Harrisburg, Pennsylvania; The Plain Dealer in Cleveland, Ohio; The Union, The News, and the Republican, in Springfield, Massachusetts; The Times-Picayune and the States Item in New Orleans, Louisiana. Advance also owned Electric Delivery System, Inc., a distribution and delivery company for the Times-Picayune and Mercury Express, Inc., a distribution and delivery company for The Birmingham News.

As of Feb. 29, 1980, Advance operated the following magazines: Vogue, Vogue Guides, Glamour, Mademoiselle, House & Garden, House & Garden Guides, Bride's, Self, Street & Smith, Analog, Vogue Patterns, and GQ in the United States; Vogue in Brazil, Australia, and Germany; Vogue, House & Garden, and Bride's & Setting Up Home in England, Vogue, Vogue Shopping, L'Uomo Vogue, Casa Vogue, Uomo Mare, Vogue Bambini, and Lei in Italy; Vogue, Vogue Beaute, Vogue Homes, Maison & Jardin, Maison, and Club Maison in France.

As of Feb. 29, 1980, Advance also owned Art Gravure and Diversified Printing, two printing companies. Advance also owned a 49-percent interest in Catawba Newsprint Co., a newsprint manufacturing company.

tions. To provide on-site management, one of the three brothers would visit each newspaper located outside of the New York City area weekly or monthly. The visiting brother would meet with the local publisher and department heads to discuss circulation, current advertising and advertising development, accounts, compensation plans, editorial quality, production facilities, and distribution. After S.I., Jr., and Donald joined the management team, the five family members would meet frequently to discuss the operations of the out-of-town newspapers and plans for the acquisition of new properties. The topics at the family meetings included the purchase of new capital equipment, consideration of policies about purchasing newsprint, the setting of rates, and discussions of circulation techniques and distribution policies.

When there was no scheduled meeting, the five family members, who all arrived at work very early in the morning, would speak with each other by telephone before other employees had come to work. Between monthly visits they communicated by telephone with the local management of newspapers they oversaw and regularly received financial reports, advertising reports, circulation reports, and other pertinent data. Financial and operating reports from the out-of-town newspapers were shared among the five family members. The family members considered the periodic visits to the out-of-town properties and the consensus decision-making to be hallmarks of their management style. Throughout Advance's history, all major decisions were reached by unanimous agreement after discussion in which all partook. Each visiting family member would write a report on the management of the out-of-town newspaper (issues, decisions, future) that was circulated to the other family members. While no person dominated the discussions, some deference in matters relating to a particular newspaper was shown to the family member who was responsible for that newspaper. Decisions were never made by voting. The consensus style of management has been utilized throughout the time the family has managed Advance. Despite disagreements, discussions always proved fruitful and consensus was reached.

In the 1950's S.I., Jr., and Donald joined their father and uncles in the business. Working primarily under the supervision of their uncles, S.I., Jr., and Donald learned the family business from the ground up. In the beginning both Donald and S.I., Jr., attended the family management meetings as mere observers but by the mid-1960's their advice was sought by their father and uncles. After several years of learning editorial and production management, S.I., Jr., and Donald were each assigned to manage an out-of-town property. S.I., Jr., worked in the Conde Nast organization and Donald started at the Long Island and the Jersey City newspapers.

The management of Advance was eventually shared among all five of the family members. Until the last year of his life when he became too ill to travel, Newhouse supervised the newspaper properties in Newark, New Jersey; Syracuse, New York; Harrisburg, Pennsylvania; St. Louis, Missouri; New Orleans, Louisiana; and Mobile, Alabama. Ted managed the newspaper properties in Portland, Oregon; Birmingham, Alabama; Huntsville, Alabama; Springfield, Massachusetts and later the Booth divisions in Michigan. Norman was responsible for the newspaper in Cleveland, Ohio, and later for the newspapers in New Orleans and Mobile when he moved to New Orleans in the late 1960's. S.I., Jr., made periodic visits to the newspaper in Cleveland, Ohio to help Norman and managed Conde Nast; after his father became ill, he oversaw St. Louis. Donald traveled with Ted to the newspapers in Birmingham and Huntsville. After his father became ill, Donald took over supervision of the operations at Newark, Syracuse, Harrisburg, Jersey City, and Staten Island.

Throughout its history, Advance had a policy of reinvesting earnings to finance further acquisitions. Advance traditionally minimized the dividends declared. From 1973 to 1979, dividends were declared and paid at their highest historical level in the amount of $200 per share although in 1977, 1978, and 1979, Advance had retained earnings of $411,206,000, $503,858,000, and $475,969,000, respectively, and total operating income of $148,217,000, $173,947,000, and $159,895,000, respectively. Each share of stock received the same amount of dividends.

B. *Capital Structure*

On August 26, 1924, the stock of Advance, viz, 200 shares of common stock, par value $100, was reclassified into 1,000 shares, no par value.

By a "Certificate of Increase of Number of Shares, Change of Previously Authorized Shares and Classification of Shares" filed August 26, 1936, Advance authorized 6,000 no-par shares divided equally among class A, class B, and class C common stock (the 1936 amendment). The right to vote for the board of directors was given to the holders of the class A stock exclusively. The class B and class C shareholders were explicitly denied the right to vote on certain matters referenced in the New York Stock Corporation Law and General Corporation Law.[3] Furthermore, the class B stock and the class C stock could be redeemed in whole or in part at the prices of $175 and $199.50 per share, respectively, after September 1, 1939, at the discretion of the board of directors. The 1936 amendment also provided for equal participation in dividends of all three classes of stock, and finally, established a liquidation preference in the Class B stock of $175 per share, then in the class C stock of $199.50 per share and ultimately in the class A stock of $333 per share, with the residual value to be divided equally among all classes.

On December 27, 1938, Advance filed a "Certificate of Change of All Its Previously Authorized Shares Without Par Value Issued or Unissued, (1) class 'A' Stock Into the Same Number of Shares of Common Stock, Without Par Value; (2) class 'B' Stock and class 'C' Stock Into the Same Number of Shares of Preferred Stock, Without Par Value And Reclassification of Shares" (the 1938 amendment). This amendment provided that the 6,000 shares of authorized class A, class B, and class C common stock would be reclassified to create two classes of stock: the 2,000 shares of class A would become no-par common stock and the 4,000 shares of class B and class C would become no-par preferred. The amendment further provided that the preferred shareholders would receive noncumulative dividends of $12 per share before any dividends would be paid to the common shareholders, and the remainder of declared

---

[3]Specifically the Class B and the Class C shareholders were denied the right to vote:

dividends would be shared proportionately by the common and the preferred shareholders. The preferred shareholders were also entitled to a liquidation preference of $187.25 per share before payment to the common shareholders of $333 per share could be made. The residual value would be divided pro rata among all shareholders. The entire voting power for the election of the board of directors was reserved to the common shareholders and the voting rights of the preferred shareholders were explicitly restricted.[4] The amendment further provided that the preferred stock could be redeemed after September 1, 1944, at $187.25 per share at the discretion of the board of directors.

On December 27, 1949, Advance filed a "Certificate of Amendment of Certificate of Incorporation" (the 1949 amendment), which provided that the preferred and the common stock would participate proportionately in all dividends. The amendment retained the preferred's liquidation preference of $187.25, but abandoned the common's liquidation preference of $333 per share and the preferred's right to share in the residual value. The common shareholders were given exclusive right to the residual liquidation value. With one important exception, the voting rights remained substantially the same.[5] Also in 1949, Advance changed its name from Staten Island Advance Co. to Advance Publications, Inc.

On December 22, 1952, Advance filed another "Certificate of Amendment of Certificate of Incorporation" which pro-

---

in a proceeding for mortgaging the property and franchises of the Corporation, pursuant to Section 16 of the Stock Corporation Law; for guaranteeing the bonds of another Corporation, pursuant to Section 19 of the Stock Corporation Law; for sale of the franchises and property, pursuant to Section 20 of the Stock Corporation Law; for establishing priorities or creating preferences among several classes of stock, pursuant to Section 36 of the Stock Corporation Law; for consolidation, pursuant to Section 86 of the Stock Corporation Law; for voluntary dissolution, pursuant to Section 105 of the Stock Corporation Law; for change of name, pursuant to the General Corporation Law * * *.

[4] The preferred was not entitled to vote:

in a proceeding for mortgaging the property and franchises of the Corporation, pursuant to Section 16 of the Stock Corporation Law; for guaranteeing the bonds of another Corporation, pursuant to Section 10 of the Stock Corporation Law; for sale of the franchise and property, pursuant to Section 20 of the Stock Corporation Law; for establishing priorities or creating preferences among the several classes of stock, pursuant to Section 86 of the Stock Corporation Law; for voluntary dissolution, pursuant to Section 105 of the Stock Corporation Law; for change of name, pursuant to the General Corporation Law * * *.

[5] Prior to the 1949 amendment, the preferred shareholders had been specifically prohibited from voting on "establishing priorities or creating preferences among the several classes of stock" but this limitation was removed in the 1949 amendment.

vided for the transformation of the 2,000 shares of authorized common stock into 20 shares of class A common voting stock and 1,980 shares of class B common nonvoting stock (the 1952 amendment). A "Certificate of Amendment of Certificate of Incorporation" was filed on January 5, 1955, to change the number of directors.

On December 27, 1956, the last change in Advance's corporate structure was made by "Certificate of Amendment to Certificate of Incorporation"[6] (the 1956 amendment) stating that: (1) Dividends were to be shared equally between the class A common, the class B common, and the preferred shareholders, (2) and the preferred shareholders were entitled to a liquidation preference of $187.25 per share before the class A common and the class B common shared equally in the residual liquidation value, and (3) the limitation on the voting rights of the preferred shareholders on voluntary dissolution was removed.

Prior to 1936, Newhouse owned 786 of the 1,000 authorized shares of Advance no-par common stock. After the 1936 amendment, Newhouse's shares were changed to 1,000 shares of class A common. At this time, 1,000 shares of class B common were issued to his wife, Mitzi Newhouse (Mitzi), and 500 shares of class C common were issued in trust for each of his sons, S.I., Jr. and Donald. After the 1938 amendment, Newhouse's class A common was exchanged for 1,000 shares of common stock, Mitzi's shares of class B common were exchanged for 1,000 shares of preferred stock and the 500 shares of class C common stock held in each trust for S.I., Jr., and Donald were exchanged for shares of preferred stock. On or about December 27, 1938, an additional 250 shares of preferred stock were issued to each trust for S.I., Jr., and Donald. In 1947, 500 shares of preferred stock apiece were issued to Ted and Norman. In 1948, the trust distributed 400 shares of preferred stock to S.I., Jr., and in 1950 the trust distributed to him an additional 350 shares of preferred stock. In 1950, the trust distributed 750 shares of preferred stock to Donald.

At the time of Newhouse's death, Newhouse still owned all the common stock and Mitzi Newhouse owned 1,000

---

[6]All future references in this opinion to "the certificate" are to the original Certificate of Incorporation as amended.

shares of preferred stock, S.I., Jr., and Donald each owned 750 shares of preferred stock and Ted and Norman each owned 500 shares of preferred stock. By will, Newhouse left 300 shares of Advance class B common stock to Mitzi.

In 1959 Advance and all of its shareholders executed separate agreements providing that at their deaths, Advance would redeem enough stock from the shareholder's estate to cover Federal estate taxes. The 1959 agreements between Advance and Ted, Norman, S.I., Jr., and Donald were superseded by a shareholders' agreement in 1974. The 1959 agreement between Advance and Mitzi was superseded in 1978 when the shareholders' agreement executed in 1974 was amended to include Mitzi's stock. The 1959 agreement between Advance and Newhouse continued in effect until the time of Newhouse's death.

On April 24, 1974, Advance, Newhouse, Ted, Norman, S.I., Jr., and Donald executed an agreement limiting the rights of any subsequent owner of the preferred stock who had not executed the agreement to dispose of their stock (the 1974 shareholders' agreement). The purpose of the 1974 shareholders' agreement was to:

> make certain the continued ability of Advance to operate as a closely held corporation with a harmonious group of shareholders, and to continue its management policies and procedures which have proven successful in the past, despite change which may result from the deaths or other transfers of shares by Theodore Newhouse, Norman N. Newhouse or Samuel I. Newhouse, Sr.

Particularly, the family members were concerned with the fragmentation of closely held, family-owned companies that they felt frequently occurred in the newspaper industry.

The 1974 shareholders' agreement provided that in the event of a sale or exchange of preferred stock, Advance would first have the right to buy the stock on the same terms as offered by the prospective buyer. Furthermore, upon the determination of a majority of the board of directors, Advance was given the right to acquire all or any part of the shares of preferred stock from a shareholder upon the death of a preferred shareholder, upon an involuntary transfer of preferred shares by operation of law or otherwise, or whenever a majority of the board of directors determined in good faith that (1) the preferred shareholder

had violated an agreement with Advance resulting in a materially adverse effect on Advance or its shareholders, (2) the shareholder threatened to dispute Advance over his rights as a shareholder, or (3) when it would be in Advance's interests to reduce the number of preferred shareholders. If the preferred shareholder and Advance could not agree on the purchase price, the "fair value" of the preferred shares would be determined by Chemical Bank. Chemical Bank's decision would be binding on the preferred shareholders and Advance and was not judicially reviewable except as required by New York arbitration law.

The 1974 shareholders' agreement also provided that at the deaths of Ted, Norman, S.I., Jr., and Donald, and their spouses, their personal representatives could require Advance to purchase preferred stock from the respective estates in an amount that satisfied, but did not exceed, the estate's cost for taxes, funeral expenses, and administrative expenses of the estate. On April 18, 1978, the 1974 shareholders' agreement was amended to include Mitzi Newhouse's 1,000 shares of preferred stock.[7]

After Newhouse's death, the estate requested Chemical Bank to determine the value of the class A common and class B common stock that Newhouse held at the date of death. In a letter dated April 29, 1980, Chemical Bank explained that, after considering financial statements for the years 1973 through 1979 and the certificate, and after visiting some of Advance's key properties, Chemical Bank concluded that the class A common stock was worth five times as much per share as the class B common stock and that the class B common stock shares were equal in value to the preferred shares. The report concluded that the value of Newhouse's class A common stock had an aggregate value of $8,595,000, viz, $859,500 per share and the class B common stock had an aggregate value of $170,181,000, viz, $171,900 per share.

## C. *State Law Issues*

There are three basic methods for a shareholder to realize value from a corporation: (1) The redemption of stock, (2)

---

[7]In 1980, the 1974 shareholders' agreement was amended to include 300 shares of Class B common stock that Mitzi received under S.I., Sr.'s will.

the payment of dividends or distributions, and (3) a merger or liquidation in which stock is cashed out or exchanged for value. Consequently, the rights and privileges of the various classes of Advance stock determine the constraints on a purchaser of the Advance common stock in attempting to realize the value of his purchase. On February 29, 1980, a buyer of the Advance common stock could have elected the board of directors. The preferred stock, however, could vote on and block corporate liquidation. On February 29, 1980, the Advance preferred stock could not be redeemed without the preferred shareholders' consent. The preferred stock could vote on any charter change that affected its class rights or gave new class rights or authorized a new class of stock. The preferred shareholders were entitled to 78 percent of all dividends declared out of current and retained earnings; the common stock was entitled to 22 percent.

The allocation of all the other rights and privileges pertaining to shareholders is unclear. The preferred shareholders might be entitled to participate equally in dividends declared from capital surplus. It is not clear whether a buyer of the Advance common stock could effect a merger to eliminate or cash out the preferred shareholders. It is also unclear what price the common shareholder would have to pay the preferred shareholders in an appraisal proceeding or a fair value proceeding under New York law. The extent of the disagreement over the rights and privileges of the classes of Advance stock under New York law would be certain to result in litigation in the event that the common shareholder attempted to cash out the preferred stock through a merger or otherwise attempted to effect a constructive redemption or liquidation that returned less than 78 percent of the value of Advance to the preferred shareholders.

Petitioner's expert witnesses on New York law included Loeber Landau, a partner with Sullivan & Cromwell who specializes in corporate and securities law, Martin Lipton, a partner with Wachtell, Lipton, Rosen & Katz who specializes in corporate and securities law, and Robert H. Mundheim, Dean of the University of Pennsylvania Law School, whose area of expertise is corporate law. With the consent of respondent, petitioner also submitted reports

without accompanying testimony from the law firm of Cravath, Swaine & Moore and from John McNally, a partner with the law firm of White & Case who specializes in corporate law.

Respondent's expert witnesses included Victor Brudney, a professor emeritus from Harvard Law School who taught finance and corporate law, Stanley Siegel, the associate dean of New York University Law School who teaches business planning, corporate finance, and tax, and John C. Coffee, Jr., a professor at Columbia University Law School who teaches corporate and securities law. With the consent of petitioner, respondent also submitted reports without testimony from Melvin A. Eisenberg, a professor of law at Boalt School of Law at the University of California at Berkeley, and James D. Cox, professor of law at Duke University.

The experts considered the relative rights and powers of the common and preferred shareholders. In preparing their reports the experts relied on the certificate, the 1974 shareholders' agreement, the New York Business Corporation Law (McKinney 1980) (the Business Corporation Law), and New York case law. The experts treated the class A common stock and the class B common stock as one block of identical shares for purposes of analyzing the relative rights of the common and the preferred stock. All the experts commenced their legal analysis from the standpoint of a prospective buyer of the common stock of Advance who would want to be able to realize value greater than his investment despite possible hostility from the preferred shareholders.

## 1. *Redemption*

The Advance stock cannot be redeemed at the request of either the shareholders or the corporation except as permitted under the 1974 shareholders' agreement. The certificate would have to be amended to force a redemption of preferred stock. Although the certificate is silent on voting rights for amendments to the certificate, sections 804 and 801(b)(12) of the Business Corporation Law provide that an amendment to "fix, change or abolish" the "relative rights, preferences and limitations" of any shares of stock "includ-

ing any provisions in respect of * * * the redemption of any shares" entitles the nonvoting shareholders to a class vote. Consequently, the preferred shareholders were entitled to a class vote on any proposed amendment to the certificate and by sheer numbers could have overruled any proposed amendment to the certificate adverse to their interests.

## 2. *Dividends*

The certificate requires that the common and the preferred shareholders participate pro rata in dividends. The common shareholder can receive only 1000/4500 or 22 percent of all dividends declared and paid out of earnings while the preferred shareholders are entitled to 3500/4500 or 78 percent.

### a. *Source of Dividends*

Section 4(a) of the certificate provides:

The holders of the Preferred Stock, the Class A Common Stock and the Class B Common Stock shall participate equally in proportion to the number of shares of such stock held by them respectively, whether Preferred Stock, Class A Common Stock or Class B Common Stock, in any and all dividends which may be declared and paid by the corporation *out of its earnings.* [Emphasis supplied.]

The experts disagreed about the common shareholder's entitlement to more than 22 percent of dividends declared from sources other than current or retained earnings such as from capital surplus. They also disagreed over whether the shareholder who forced a sale of assets would be entitled to more than 22 percent of dividends out of sales proceeds. The dispute focused in part over the characterization of the proceeds as earnings or capital surplus.

### b. *Stock Split or Stock Dividend*

There were 1,000 shares of authorized and unissued common stock and 500 shares of authorized and unissued preferred stock on February 29, 1980. For the common shareholder to dilute the voting power of the preferred shareholders sufficiently to obtain the power to liquidate Advance, the certificate would have to be amended to authorize the issuance of new stock. Even if the common shareholder distributed all the authorized but unissued

stock to himself, he would not have enough to force liquidation. Under New York law a stock split requires the approval of the shareholders. An attempt to dilute the voting power of the preferred shareholders through a stock split or a stock dividend would also require an amendment to the certificate.

New York law provides for preemptive rights to shareholders whose shares have unlimited dividend rights where the issuance of new shares would adversely affect the shareholders' dividend rights under section 622(b) of the Business Corporation Law. The experts disagreed whether a plan by the common shareholder to issue himself additional stock would give rise to preemptive rights in the preferred stock.

### c. *Nonpayment of Dividends*

Despite the preferred shareholders' entitlement to 78 percent of declared and paid dividends, the common shareholder could, through his control over the board of directors, cease declaring dividends altogether. The experts disputed the extent that fiduciary obligations of the board to the preferred shareholders would limit their exercise of this power.

### 3. *Liquidation or Merger*

Under the terms of the certificate, the preferred shareholders are entitled to receive only $187.25 per share in the event of liquidation. All the experts assumed that a purchaser of the common stock would prefer liquidation as the means to extract the value of the investment and that the preferred shareholders would oppose liquidation.

### a. *Liquidation*

Under New York law, liquidation requires a two-thirds majority. The experts agreed that as of February 29, 1980, the preferred shareholders were entitled to vote on the liquidation. Section 612(a) of the Business Corporation Law provides a vote for each share of stock of all classes of stock unless specifically denied by the certificate of incorporation. Because the right to vote on liquidation is not

explicitly denied to the preferred shareholders, the statute authorizes a vote.

## b. *Mergers*

The experts on both sides focused primarily on several possible merger transactions the common shareholder could employ to try to limit the preferred shareholders' rights. The objectives of any merger would be to dilute the preferred stock, to reduce its claim to dividends, and to eliminate the class. A vote on mergers is explicitly reserved to the common shareholders in the certificate. The possible mergers discussed were (1) the freeze-out merger, and (2) the freeze-in merger.

### (1) *Freeze-Out Merger*

In a freeze-out merger, the common shareholder's goal is to force a merger that would require the preferred shareholders to exchange their Advance stock for cash. The common shareholder could then either retain his interest in the corporation, sell it, or liquidate it. Respondent's experts believed that the common shareholder could implement this plan because the common stock controls the election of the board of directors and has practical control over the board's decisions. The freeze-out merger would merge Advance into a corporation owned by the common shareholder or the purchaser. The common shareholder would exchange Advance common stock for the stock of the acquirer while the preferred shareholders exchanged their stock for cash. The experts disagreed about whether such a merger would be allowed over the objections of the preferred shareholders. Section 903(a)(2)[8] of the Business Corporation Law provides for a class vote if a plan for merger contains an amendment to the certificate which would entitle the shareholders of that class to vote. Business Corporation Law sections

---

[8]Sec. 903(a)(2) provides that notwithstanding any provision in the certificate of incorporation:

the holders of shares of a class or series shall be entitled to vote and to vote as a class (on a merger) if the plan of merger * * * contains any provision which, if contained in an amendment to the certificate of incorporation, would entitle the holders of shares of such class or series to vote and to vote as a class thereon. In such case, in addition to the authorization of the merger * * * by vote of the holders of two-thirds of all outstanding shares entitled to vote thereon, the merger * * * shall be authorized by vote of the holders of a majority of all outstanding shares of each class or series.

804(a)(2)[9] and 801(b)(12)[10] provide a class vote on amendments that change or abolish the relative rights and preferences of any shares of stock. In light of these rights, the historical participation of the preferred shareholders in directing corporate affairs, their understanding that the shares were of equal value, on the one hand, and the common stock's right to elect the board of directors, approve sales of assets, and approve mergers, on the other, the experts dispute whether the preferred shareholders would have a class vote on the proposed merger, and, if they did not, whether the freeze-out merger would be allowed under New York law.

### (2) *Freeze-In Merger*

In a freeze-in merger, the common shareholder exchanges his Advance stock for cash or stock in an acquiring company while the preferred shareholders retain their Advance stock. This proposal would be intended to dilute the preferred shareholders' ability to block liquidation, by authorizing and issuing at least 6,000 new shares of voting common. The Advance common stock would be traded to the acquiring company in exchange for its stock. Because the common shareholder would then hold 7,000 shares of stock, a liquidation could be accomplished over the objection of the preferred shareholders. Although the preferred shareholders would retain their stock, they would have lost their ability to influence the affairs of Advance and would be susceptible to redemption. The acquiring corporation

---

[9]Sec. 804(a) provides a class vote on a certificate amendment that would:

(1) Exclude or limit their right to vote on any matter, except as such right may be limited by voting rights given to new shares then being authorized of any existing or new class or series.

(2) Change their shares under subparagraphs (b)(10), (11) or (12) of section 801 *** or provide that their shares may be converted into shares of any other class or into shares of any other series of the same class, or alter the terms or conditions upon which their shares are convertible or change the shares issuable upon conversion of their shares, if such action would adversely affect such holders, or

(3) Subordinate their rights, by authorizing shares having preferences which would be in any respect superior to their rights.

[10]Secs. 801(b)(10), (11), and (12) referred to in sec. 804(a)(2) apply to certificate amendments that would:

(10) * * * reduce the par value of any authorized shares of any class with par value, whether issued or unissued.

(11) * * * change any authorized shares, with or without par value, whether issued or unissued, into a different number of shares of the same class or into the same or a different

would then be able to overpower the preferred shareholders and liquidate Advance. As with the freeze-out merger, the experts disputed whether the freeze-in merger would be allowed over the objections of the preferred.

## D. *Valuation Opinions*

In order to demonstrate the correct value of the Advance common stock, the parties introduced the testimony of several experts. Peter Fahey and Gary Gensler, partners with the investment banking firm of Goldman Sachs & Co., prepared reports and testified for petitioner about the fair market value of the Advance common stock.[11] Petitioner also introduced the reports and testimony of Robert J. Harrity of Chemical Bank on the value of the common stock, and David Wilkofsky of Wilkofsky, Gruen Associates, Inc., on the general economic conditions of the newspaper and magazine publishing industries in 1979 and early 1980. Rupert Murdoch, the chief executive officer of The News Corp., a newspaper and magazine publishing company, and Douglas McCorkindale a vice president of Gannett Corp., a media company, both testified about the criteria a buyer would use in considering the purchase of the Advance common stock.[12] Respondent introduced the report and testimony of Joseph P. Baniewicz, a financial analyst for the Internal Revenue Service.

According to the experts from Goldman Sachs and Chemical Bank, there were a number of factors that would have influenced a prospective buyer of the Advance common stock. Some, such as the capital structure and uncer-

---

number of shares of any one or more classes or any series thereof, either with or without par value.

(12) * * * fix, change or abolish the designation of any authorized class of any series thereof or any of the relative rights, preferences and limitations of any shares of any authorized class or any series thereof, whether issued or unissued, including any provisions in respect of any undeclared dividends whether or not cumulative or any sinking fund for the redemption or purchase of any shares, or any preemptive right to acquire shares or other securities.

[11]Respondent challenged the expertise of the Goldman Sachs employees because they are "graduates of business schools with no formal education in the valuation of stock." Fahey and Gensler testified that they routinely value stock in closely held corporations in order to advise their clients on possible purchases or sales. We do not share respondent's doubt as to their qualifications.

[12]Respondent challenged the relevance of the testimony of Murdoch and McCorkindale because neither wanted to purchase the Advance stock. It is their views on the considerations warranted in analyzing the potential purchase of the Advance common stock, not whether they would in fact have purchased the stock, that interest us.

tain relative rights and limitations of the Advance stock, were internal to Advance. Others, such as the particular economic conditions of the newspaper and magazine publishing industries and the general negative economic mood of 1979 and early 1980, were external to Advance. The size and financial strength of Advance itself, particularly in comparison with other newspaper and magazine publishing companies, would have been a consideration for a prospective willing buyer. Finally, the most likely willing buyers would have faced other concerns, such as antitrust considerations or difficulties complying with Federal Communications Commission regulations, that would have affected the ultimate selling price.

### 1. *General Economic Conditions*

In late 1979 and early 1980, high inflation and "record high" interest rates predominated. Many economists were uncertain or pessimistic about the near future, forecasting an economic slowdown or recession. The 1979 decision of the Federal Reserve Board to manage the supply of money rather than interest rates resulted in a sharp rise in interest rates. Although the economy had experienced a period of growth after the recession of 1974-1975, in 1979 economic growth slowed again, as inflation rose rapidly and interest rates soared. The gross national product grew at an annual rate of only 1.2 percent in constant dollars in the first half of 1980; unemployment was high and was expected to rise, and oil prices were increasing.

One of the byproducts of the tightening money supply and unrestrained interest rates was a new attitude of wariness and reluctance to lend on the part of many banks and lending institutions. In late October of 1979, the Chairman of the Federal Reserve Board warned banks against making "nonproductive" takeover loans. Due to the negative economic outlook, the late 1970's experienced a decline in merger activity. Of the acquisitions for which data was disclosed, only 2 percent of the private companies acquired in the first half of 1980 were sold for more than $100 million.

## 2. *Industry Economic Conditions*

The economic malaise of the country affected the newspaper and magazine publishing industry. Although revenues rose, the increase was consumed by inflation. The newspaper publishing industry was considered "mature" by the late 1970's. The markets for Advance's newspapers had been fully penetrated, and newspaper circulation was expected to remain fairly constant and stable.

The newspaper and magazine publishing industry also suffered from the growing competition of television in late 1979 and early 1980. Local advertising revenues were increasingly devoted to television at the expense of newspapers, particularly evening newspapers, and, in 1980, newspaper advertising revenues were expected to decline, in real terms. The popularity of evening newspapers had begun to be displaced by the television evening news. Most of the large newspaper publishing companies were acquiring holdings in the broadcast media to diversify away from the newspaper business. Furthermore, the use of "preprints," printed advertising inserts that were slipped into the newspapers for a fee, grew in the later 1970's. The fee brought in from preprints was less than the revenue that straight advertising would have generated. The preprint publishers competed with newspaper publishers for advertising dollars.

Economic conditions discouraged advertising expenditures. Television was becoming a considerable rival for local advertising dollars and cable television was expected to continue the trend as independent television stations competed for local advertising dollars. The annual growth rate for total newspaper advertising dropped from 13.5 percent in 1979 to 6.7 percent in 1980 although retail spending growth only declined from 14.9 percent in 1979 to 10.9 percent in 1980. Furthermore, much of the growth that did occur in advertising in 1979 and 1980 came from increased use of preprints and did not significantly benefit the newspaper publishing companies.

Due to adverse economic conditions, total newspaper circulation per adult declined between 1975 and 1980 and the rate of that decline increased in 1979 and 1980. The decline in circulation was largely attributable to the decline

in evening newspaper readership. Similarly, circulation revenue grew between 1975 and 1978 but then tapered off and actually declined by 5.1 percent in 1980.

The costs of newsprint and production labor rose, as the total spending on newspapers was decreasing in 1979 and 1980. Total expenditures for newsprint rose in 1979, outpacing the increase in newspaper revenues from 1979 to 1980. Although labor costs were suppressed by labor contracts predating the period of acute inflation, the labor contracts also delayed automation by requiring newspaper publishing companies to retain costly labor-intensive printing processes. Additionally, the decrease in bulk mail rates in 1978 caused an increase in direct mail advertising which, in turn, cut into newspaper advertising revenue.

The health of the magazine publishing industry also weakened in the late 1970's and early 1980. Because magazine advertising is national, magazine publishing industry conditions reflected the overall economic conditions. A slowdown in advertising expenditures began in 1979 and worsened in 1980. Magazine circulation dropped at the same time. Finally, the Wilkofsky report mentioned that in 1979 and 1980 the growth in production labor costs exceeded the growth in magazine revenues.

## 3. *Competitive Position*

Many of Advance's newspaper properties were situated in economically depressed markets that suffered from low population growth and high unemployment. Many of the markets in which Advance operated newspapers were extremely competitive. Additionally, in its 22 newspaper markets, Advance operated 10 morning newspapers, 19 evening newspapers, and 21 Sunday newspapers, so, in all but three of its markets, Advance had evening newspapers. In over half its markets Advance published no morning paper. In 1979, Advance's revenues increased by only 4.1 percent though inflation grew at the rate of 11.3 percent. Operating margins for Advance's newspaper properties declined from 21.6 percent in 1978 to 18 percent in 1979, resulting in a 13-percent decline in operating income for 1979. Furthermore, the rate of increase in total advertising linage decreased and total circulation actually decreased. For Advance's aggregate operations, operating income fell

by $14 million from 1978 to 1979 and the operating margin decreased from 17.8 percent in 1978 to 14.8 percent in 1979.

Advance's subsidiary, Conde Nast, published seven consumer magazines that were predominantly fashion oriented. Although revenues were increasing in 1979, costs were increasing faster. Conde Nast's operating cash-flow margin declined from 14 percent in 1977 to 7.8 percent in 1979.

### 4. *Size of Advance*

As of February 29, 1980, Advance was the fourth largest newspaper and magazine publishing company in the United States. On December 31, 1979, Advance had a consolidated book value of $505,400,000 and retained earnings of $475,969,000. At that time, only seven or eight corporate acquisitions for more than $1 billion had ever occurred, and there had been no acquisitions of more than $350 million in the media industry.[13]

In early 1980, before leveraged buy-outs gained wide popularity, Advance could have borrowed an amount requiring interest obligations of not more than two-thirds of its operating income or, under the prevailing interest rate of 18¾ percent, $565 million. Because Advance had planned capital expenditures of $228 million, the remaining $337 million would be available to be distributed to the shareholders. Of this amount, only 22 percent would belong to the common shareholder.

### 5. *Legal Uncertainty*

A prospective buyer of the Advance common stock would want to know the rights of the preferred shareholders to gauge what corporate affairs the common stock could control and to project how to maximize the value of the investment. The prospective buyer would have received contradictory expert legal opinions on the relative rights and privileges of the common and preferred stock. This uncertainty would significantly depress the purchase price of the common stock. The prospective buyer would have been sure of protracted and expensive litigation. A substantial likelihood of considerable delay in effecting plans to

---

[13]In 1976, the Herald Co., a subsidiary of Advance, acquired Booth Newspapers, Inc., for $304,588,598.

cash-out the preferred existed. The litigation might take between 6 and 10 years to resolve in New York courts, and substantial probability existed that any action taken by the common shareholder to defeat the claims of the preferred shareholders would be blocked. Furthermore, because interest rates in February 1980 were extraordinarily high and the size of Advance would require financing, the carrying costs of the purchase would be enormous.

## 6. *Antitrust and FCC Difficulties*

Generally, only a media business would be interested in purchasing Advance. Because only a very sizable media business could afford to buy Advance, it would be likely that some of the potential buyer's newspaper and magazine markets would overlap with some of Advance's newspaper and magazine markets. This would raise potential problems under both the antitrust laws and the Federal Communications Commission (FCC) regulations.

The operative antitrust law looks to whether a purchase might lessen competition, and the Department of Justice monitored newspaper acquisitions with particular scrutiny in 1980. A newspaper and magazine publisher that bought the Advance common stock would probably need to sell some current holdings or sell off some of Advance's assets after the purchase. As with antitrust, the FCC cross-ownership rules might require the buyer to sell certain assets.

## 7. *Accounting Problem*

The experts disagreed that, if the buyer were a corporation, the common shareholder could not report in its consolidated earnings the full amount of Advance's earnings and profits without, at a minimum, disclosing that the preferred shareholders were entitled to 78 percent of declared dividends out of those earnings. If a corporate buyer of Advance's common stock were to attribute more than 22 percent of Advance's earnings to the common stock interest, the financial statements would not comport with generally accepted accounting principles and would result in a qualified opinion on the buyer's consolidated financial statements. Such a qualified opinion would be unacceptable

to users of the financial statements, including, for example, lenders, shareholders, and if the buyer's stock was publicly traded, the public.

## II. VALUE OF N.B. CO. COMMON STOCK

N.B. Co. is a corporation that was organized under the laws of the State of New York in August 1944. On February 29, 1980, its principal place of business was located in Syracuse, New York. N.B. Co., either by itself or through wholly owned subsidiary corporations, operated television broadcasting, radio broadcasting, cable television, and microwave businesses. N.B. Co. operated radio and television broadcasting stations in Syracuse, New York; Elmira, New York; Birmingham, Alabama; Harrisburg, Pennsylvania; and St. Louis, Missouri. N.B. Co. operated cable television companies in many localities in New York State[14] and in Corapolis, Pennsylvania; Canonsburg, Pennsylvania; and Anniston, Alabama. N.B. Co. operated microwave stations in New York, New Hampshire, New Jersey, Ohio, Massachusetts, Vermont, Pennsylvania, and Alabama. As of February 29, 1980, N.B. Co. had contracted to sell all of its television broadcasting stations. The total value of N.B. Co. on the valuation date was $206,361,416.

N.B. Co. had one class of stock authorized. As of February 29, 1980, 225 shares of voting common stock were authorized and outstanding, owned as follows:

| Shareholder | No. Shares | Percentage |
|---|---|---|
| Petitioner | 100 | 44.44 |
| S.I., Jr. | 60 | 26.67 |
| Donald | 60 | 26.67 |
| Mitzi | 5 | 2.22 |

In its estate tax return, petitioner valued the N.B. Co. stock at $68.3 million based on a valuation report prepared by Chemical Bank.

## OPINION

## I. VALUE OF ADVANCE COMMON STOCK

The first issue for our decision is the value of Newhouse's

[14]These are: Carthage, Corning, Delhi, Fulton, Malone, Massena, Ogdensburg, Oneonta, Potsdam, Rome, Sidney, Syracuse suburbs, Troy, Binghamton, Vestal/Endicott, Cooperstown, Franklin, Milford, New Berlin, Oxford, and Richfield Springs.

10 shares of class A common stock and 990 shares of class B common stock as of February 29, 1980. A derivative issue is the value, for purposes of the marital deduction, of 300 shares of class B common stock.

Property is included in the gross estate at its fair market value, which is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; *United States v. Cartwright,* 411 U.S. 546, 551 (1973). If the property is stock that is not listed on an exchange and cannot be valued with reference to bid and asked prices or historical sales prices, the value of stock in comparable corporations engaged in the same or similar line of business must be considered. Sec. 2031(b). Also considered are the corporation's management, net worth, earnings, and ability to pay dividends. *Estate of Leyman v. Commissioner,* 40 T.C. 100, 119 (1963), remanded on other grounds 344 F.2d 763 (6th Cir. 1965).

The determination of the fair market value of property is a question of fact. *Hamm v. Commissioner,* 325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. At trial, we received opinion evidence testimony from many expert witnesses, and we weigh that testimony in light of the expert's qualifications as well as all the other credible evidence. *Estate of Christ v. Commissioner,* 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); *Estate of Gilford v. Commissioner,* 88 T.C. 38, 56 (1987). Nonetheless, we are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. *Helvering v. National Grocery Co.,* 304 U.S. 282, 295 (1938); *Estate of Hall v. Commissioner,* 92 T.C. 312, 338 (1989).

Respondent's Revenue Ruling 59-60, 1959-1 C.B. 237, has been widely accepted as setting forth the appropriate criteria to consider in determining fair market value; it lists the following factors to be considered:

(a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity

of the company. (e) The dividend paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued. (h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. [1959-1 C.B. at 238-239.]

Only facts reasonably known at the valuation date may serve as the basis for valuation. *Estate of Gilford v. Commissioner,* 88 T.C. 38, 52-53 (1987). Generally, valuations based on subsequent events whose occurrence was not foreseeable at the time of the valuation date are not helpful. *Messing v. Commissioner,* 48 T.C. 502, 509 (1967).[15] The willing buyer is a purely hypothetical figure and valuation does not take into account the personal characteristics of the actual recipients of the stock. *Estate of Bright v. United States,* 658 F.2d 999, 1006 (5th Cir. 1981). The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage. *Estate of Curry v. United States,* 706 F.2d 1424, 1429 (7th Cir. 1983). This advantage must be achieved in the context of market conditions, the constraints of the economy, and the financial and business experience of the corporation existing at the valuation date. Moreover, in valuing stock, the rights, restrictions, and limitations of the various classes of stock must be considered.[16]

## A. *State Law Issue*

A willing buyer would want to know the relative rights and powers of the two classes of common stock and one class of preferred. If the rights and powers of the preferred stock are sufficient to significantly limit the ability of the common stock to control the company and its assets, then the value of the common stock will be significantly less than if the common enjoyed full and unrestricted control over corporate affairs. The parties agree that the common stock controls the board of directors and, by extension, the management of the business and that the preferred share-

---

[15]Subsequent events affecting the character or quality of the property to be valued should be distinguished from subsequent market activity which can provide helpful comparable sales.

[16]See *Estate of Anderson v. Commissioner,* T.C. Memo. 1988-511. E.g., *Estate of Van Horne v. Commissioner,* 78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983).

holders have the ability and the motivation to block a proposed liquidation.

Respondent believes that the common stock, through other means than by liquidation, could arrogate to itself substantially all of the value of Advance. Respondent proffers the "subtraction method" of valuation, i.e., value the whole of Advance, value the preferred, and the difference equates to the value of the common. Petitioner argues that the common stock does not control Advance, and the preferred is entitled to 78 percent of dividends declared out of earnings. Consequently, the preferred is worth far more than respondent believes. Moreover, petitioner argues, the extent of the common stock's rights to force the preferred out of Advance are unclear at best. With this uncertainty, the value of the common stock is substantially less than respondent determined.

### 1. *Redemption*

The certificate could be amended to allow redemption of the preferred stock only with the consent of the preferred shareholders. Respondent's experts do not dispute the power of the preferred shareholders to block an amendment that could force redemption of the preferred stock. The common shareholder cannot force the redemption of preferred stock.

### 2. *Dividends*

The experts from both sides presumed that a buyer of petitioner's common stock would want to eliminate or at least limit the preferred shareholders' rights to 78 percent of declared dividends. They discussed several ways of doing this.

### a. *Source of Dividends*

The experts agree that all shareholders participate pro rata in dividends declared out of earnings. Respondent's experts, Coffee and Siegel, believe that the certificate's allocation of dividends among the shareholders limits the preferred shareholders to a fully participating share only from those dividends paid out of earnings or earned

surplus.[17] The preferred would not, in their view, participate in distributions of capital surplus, ordinarily available as a source for dividends under New York law.[18] Siegel and Coffee concluded that the common shareholder could receive dividends paid out of capital surplus, for example, by borrowing against assets and distributing the cash to the common shareholder without sharing the distribution with the preferred shareholders.

Petitioner's expert, Mundheim, disagreed and opined that the certificate does not speak at all about dividends paid from sources other than earnings. Alternatively, Mundheim noted, the language could mean that no shareholder, preferred or common, could receive dividends paid out of capital surplus. Mundheim explained that under New York corporation law there is a general underlying assumption that all shares are considered equal and therefore, differences between various classes of stock must be specifically designated and will not be inferred. Mundheim concluded that because the meaning was ambiguous, a New York court would construe the certificate against the background of the general rule that classes of stock are different only to the extent the differences are explicit, and would conclude that the two classes of stock should participate pro rata as to dividends from sources other than earnings as well.

Regardless of the source of dividends, the experts on both sides agreed that a prospective buyer of the Advance common stock would want to circumvent the preferred shareholders' right to 78 percent of declared dividends. To avoid paying the major portion of dividends to the preferred shareholders, the common shareholder would have to alter the preferred shareholders' rights and privileges, but the experts disagreed about whether the common shareholder could succeed.

---

[17]Under New York law, "earnings" is defined as the corporation's income in a current year, "earned surplus" is defined as retained and undistributed earnings from prior years, and "capital surplus" is defined as unrealized appreciation in assets.

[18]Sec. 510 of the Business Corporation Law permits a corporation to make dividend distributions in cash, property, or bonds unless to do so would make the corporation insolvent, would violate a term of the corporate charter, or would reduce the value of net assets remaining in the corporation below the value of stated capital.

## b. *Stock Split or Stock Dividend*

Mundheim also concluded that because an amendment to increase the number of shares held by the common shareholder would clearly impinge on the voting rights of the preferred stock, the preferred shareholders would be allowed to vote against the proposed amendments under sections 801(b)(12) and 804 of the Business Corporation Law. Respondent's experts agree that the common shareholder would be unable to effect a stock split or stock dividend without the consent of the preferred shareholders.

## c. *Preemptive Rights*

Shareholders generally have preemptive rights where the issuance of new shares would adversely affect their dividend rights. Coffee, respondent's expert, argued that the preferred shareholders would not have preemptive rights to acquire unissued or treasury shares of stock pursuant to exceptions to section 622(b) of the Business Corporation Law. As of February 29, 1980, Advance had no treasury shares and if all authorized common stock were issued it would not give the common shareholder the power to liquidate Advance. Because section 622 also provides an exception for the issuance of new shares necessary for a merger or consolidation, Coffee believed that new shares could be issued to the common shareholder pursuant to a plan of merger and could dilute the preferred shareholders' control over liquidation.

Lipton, petitioner's expert, countered that Coffee's maneuver would be viewed, not as necessary to effect a merger, but as an attempt to derogate the preferred shareholder's rights. A New York court, in Lipton's view, would not permit the dilution of the preferred stock.

## d. *Nonpayment of Dividends*

Coffee noted that the board of directors could stop paying dividends. He argued that a decision by the board of directors to curtail or cease the payment of dividends would be difficult to overturn because New York courts are highly disinclined to review a corporation's dividend policy. According to Coffee, in order to force the board of directors to pay dividends in New York, a shareholder must show that

the nonpayment expressed hostility to the shareholders directly and that the failure to pay dividends was detrimental to both the shareholders and the corporation. Coffee further noted that Advance's past dividends had historically been low in relation to its earnings and that a preferred shareholder would find it particularly difficult to force a hostile board of directors (elected by the common) to pay dividends.

The Cravath, Swaine & Moore report submitted by petitioner maintained that an abrupt cessation of dividends without a demonstrable business purpose might constitute a breach of the directors' fiduciary duties. Furthermore, although the nonpayment of dividends may be burdensome to the preferred shareholders, it has an obvious correlative detriment for the common shareholder's extraction of corporate profits.[19]

The common shareholder could not force a redemption of the preferred stock and probably could not issue more stock to himself to dilute the preferred shareholders' voting power. Finally, the board of directors elected by the common shareholder might not be allowed to cease all dividends. Therefore, the common shareholder's ability to defeat the claims of the preferred shareholders to 78 percent of earnings is subject to considerable doubt.

### 3. *Liquidation or Merger*

All of the experts considered liquidating or merging the corporation as a way to disenfranchise the preferred shareholders.

### a. *Liquidation*

The experts proceeded on the assumption that the preferred shareholders would not agree to a liquidation because the certificate sets a liquidation preference for the preferred stock at only $187.25 per share. Because the preferred shareholders are entitled to vote on liquidation, they could prevent it. This assumption comports with economic reality.

---

[19]Siegel suggests that the common shareholder might avoid the hardship of the cessation of dividends by paying himself a handsome salary but such a possibility implies that the common shareholder is an individual, not a corporation, and thus, impermissibly relies on personal characteristics of a particular willing buyer. See *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1981).

## b. *Mergers*

The experts disagreed at all points on whether the common shareholder could dispose of the preferred shareholders by freeze-out or freeze-in merger.

### (1) *Freeze-Out Merger*

Mundheim and Landau, petitioner's experts, noted several problems with the proposed freeze-out merger, structured as an acquisition by a third-party corporation. Mundheim and Landau found a significant likelihood that, under New York law, the preferred shareholders as a class would be entitled to vote on a freeze-out merger notwithstanding the fact that the certificate expressly reserves voting power over mergers to the common shareholder. Cravath, Swaine & Moore agreed, noting that a merger that threatened to diminish the preferred shareholders' entitlement to dividends or required the preferred shareholders to exchange their stock for cash would trigger a class vote. If the proposed freeze-out merger were viewed as a forced redemption, because its effect is to abolish the rights of the preferred, a class vote would be triggered because the preferred would be entitled to vote if the forced redemption were attempted in the form of an amendment to the certificate. Lipton also observed that the freeze-out merger amounts to a de facto forced redemption which is not permitted under the certificate. He opined that the common stock could not accomplish by indirect means what is forbidden by direct means.

Landau also noted that the historical development of the rights and privileges of the two classes of stock from the original certificate through the various amendments shows that the preferred shareholders were increasingly given a participating role through the capital structure. Landau concluded that the preferred shareholders were given equal status with the common shareholders in sharing the future earnings of Advance.

Respondent's experts disagreed that the preferred shareholders would be entitled to a class vote in the event of a freeze-out merger. Coffee based his conclusion on his analysis that the statutory language refers only to situations in which the "relative rights, preferences, or limita-

tions" of the minority shares are changed and not to the total cancellation of the stock. He argued that:

the purpose of both sections 804 and 903 is to protect *continuing* shareholders against a change in their legal rights, not to prevent the voting majority from cashing out another class. The danger addressed by these sections was that of being locked in under a new and different legal regime, *not that of being frozen out.*

Coffee noted that not only does the statute protect minority shareholders from abuse by the majority shareholder, but it also protects the majority shareholders from unreasonable minority shareholders. Brudney and Siegel echoed Coffee's reasoning in their reports.

Petitioner's experts doubted whether such a transaction could pass muster under the New York requirement of fiduciary care on the part of the board of directors toward the shareholders, especially if the merger had no business purpose. Mundheim noted "under New York law, directors and controlling shareholders, such as the holder of Advance's common stock, have broad fiduciary responsibilities and may not direct the affairs of the corporation so as to favor themselves at the expense of other shareholders." Landau agreed. Mundheim concluded that because such a merger would have no purpose other than to force out the preferred shareholders for the exclusive benefit of the common shareholder, a New York court would not uphold it. Cravath, Swaine & Moore's report stated that where the corporate structure clearly protects the preferred shareholders' right to prevent liquidation, a court would not allow the board of directors to accomplish indirectly what they could not do directly.

Mundheim determined that a freeze-out merger could violate the New York requirements of procedural and substantive fairness. The leading New York case, *Alpert v. 28 Williams Street,* 63 N.Y.2d 557, 483 N.Y.S.2d 667, 473 N.E.2d 19 (1984), imposes an overall equitable requirement that a freeze-out merger must have an "independent corporate purpose for the merger" and include a fair price for the shareholders who are being frozen out. Mundheim noted that the court in *Alpert* ruled that a fair cash-out price would be "reasonably related to the value that might

be set by an appraisal proceeding" and offered five factors for determining that amount.[20] Mundheim stated that it was impossible to be sure at the date of purchase of the common stock what fair value the New York courts might set for the preferred stock. While it was unclear whether a New York court would aim for the going concern price or the liquidation price in setting fair value, he noted that under recent New York cases, fair value might not be restricted by contractual provisions. In Mundheim's view a court might look beyond the stated liquidation preference amount and historical dividends and decide that the preferred and the common stock were fundamentally equal.

Lipton opined without equivocation that the preferred would be entitled to 78 percent of the going concern value of the corporation because "the terms of the Preferred Stock were specifically engineered to ensure that the holders of the Preferred Stock share proportionately in *whatever* level of pay-out the Company as a going concern makes on its capital stock." Lipton also suggested that a court might determine that the common shareholder had breached his fiduciary duties if, in negotiating the terms of the proposed merger, the common shareholder allocated more than 22 percent of the purchase price to the common and gave the preferred shareholders less than 78 percent of the purchase price.

Respondent's experts did not believe that the proposed freeze-out merger would violate those fiduciary duties. Eisenberg noted that under New York law, preferred stock is purely a creation of contract law and that the only fiduciary duty running to a preferred shareholder is the duty to satisfy the contractual entitlements. Since the proposed merger would not violate any of the Advance preferred shareholders' existing contractual rights, he reasoned they would have no grounds to complain of unfair treatment.

Respondent's experts concluded that although the preferred shareholders were entitled to receive fair value in the event of a freeze-out merger, the courts would not be inclined to value the rights of the preferred shareholders at

---

[20]The five factors listed in *Alpert v. 28 Williams Street*, 63 N.Y.2d 557, 483 N.Y.S.2d 677, 665, 473 N.E.2d 19 (1984), are net asset value, book value, earnings, market value, and investment value.

78 percent of the total value of the corporation. Coffee believed that a New York court would not derive fair value by measuring the corporation's going concern value but rather would compute the weighted average of the liquidation preference, the historical dividends, the book value per share, and the recent earnings history. Furthermore, Coffee noted that even if the court disagreed with the figure offered by the common shareholder, it would simply require that a higher price be paid, still allowing the transaction to proceed.

Brudney believed that a New York court would be most influenced by the historical dividend stream in computing fair value for the preferred stock. Because Advance has historically always reinvested the bulk of its earnings and paid minimal dividends, he opined, the preferred shareholders are on notice that they are entitled to no more than a future projection of historical dividends, or "the capitalized value of an annual amount equal to the dividend paid to [the preferred shareholders] during the last several years." Siegel concluded that fair value would lie between the liquidation preference amount of $187.25 per share and a number representing maximum possible dividend participation in Advance as a going concern.

Finally, all the experts agree that not only would a merger have to be fair but the transaction would have to have a business purpose that would benefit Advance as a whole and not just the controlling shareholder. Nonetheless, the experts disagreed about what constitutes a valid business purpose under New York law.

If the freeze-out were perceived as little more than an attempt to dispossess the preferred shareholders as cheaply as possible, petitioner's expert, Mundheim, believed it would not be sustained by a New York court. Mundheim explained that in the proposed freeze-out "there would be no independent corporate purpose—no improvement in management, no increase in capitalization, simply a reshuffling of the corporate structure for the exclusive benefit of the Common Stock at the expense of the to-be-ousted Preferred Stock." McNally agreed that a New York court would not consider the removal of the preferred shareholders for the sole

benefit of the common shareholder to be a sufficient business purpose.

Respondent's expert, Coffee, agreed that the New York courts require a business purpose but argued that it does not have to be substantial. As a possible business purpose, Coffee suggested the need to avoid Advance's future obligation to redeem the preferred shares at the death of the shareholders, or the need to be able to redeem the preferred shares in the event of a future transfer by an existing shareholder in order to remain a closely-held corporation. Coffee also recommended the need to avoid hostility and dissension among the shareholders as a valid business reason.

## (2) Freeze-In Merger

The objective of this transaction would be to dilute the preferred stock by issuing proportionately more common in the course of the merger while leaving the preferred stock in place. The dilution would have to be sufficient to give the common the ability to liquidate Advance over any objection by the preferred. Petitioner's experts, Landau and Mundheim, determined that like the freeze-out merger, the freeze-in merger would also trigger the class vote under sections 801(b)(12) and 804 of the Business Corporation Law. Although the freeze-in merger would appear to leave the rights and preferences of the preferred stock unchanged, Landau and Mundheim believed that a New York court would not stop at a superficial analysis. Because the rights of the preferred would in effect be dramatically reduced by the presence of an increased number of voting common shares, the statute would impose a class vote. Respondent's experts disagree because the form of the transaction leaves the preferred shareholders untouched.

Acknowledging that there are no dispositive New York cases on this point, Mundheim warned that the freeze-in merger would be subject to the same judicial requirements of business purpose and procedural and substantive fairness, as well as fiduciary duties, as the freeze-out merger. Mundheim concluded that a New York court would not be satisfied that the transaction had a business purpose.

Respondent's expert, Siegel, stated that "There appears to be no reason why the business purpose test, as applied under New York law, would be applied more restrictively to a freeze-in than to a freeze-out." Coffee agreed that although the preferred shareholders in a freeze-in merger would have to be treated equitably and the preferred stock could not be diluted unfairly, "the burden on the plaintiffs attacking such a [freeze-in] merger would be substantially higher than in the case of a 'freeze-out' merger." Coffee and Eisenberg surmised that if the preferred shareholders were guaranteed the continuation of the historic dividend rate as a part of the terms of the merger they would have no grounds to complain of mistreatment. Coffee also suggested that if the board of directors were composed of persons who were neither shareholders nor corporate management, their actions would be substantially immunized from derivative suits by minority shareholders.

As Mundheim noted, considering the size of Advance, the purchaser would have to capitalize the acquiring corporation in the proposed merger very heavily. Furthermore, although the common shareholder would want the freeze-in to be done quickly because the Advance preferred shareholders would be entitled to 78 percent of declared dividends until the merger was approved and the carrying costs of the investment in the common would be significant, the inevitable litigation would foreclose any quick accomplishment of the merger.

### (3) *Waiting Out the Preferred*

Respondent's expert witnesses suggested that the buyer of Advance common stock could ultimately acquire complete control by buying the preferred stock as it is transferred from the existing preferred shareholders to new owners. Coffee outlined a plan which could be employed in lieu of the mergers: first, the common shareholder would replace the board of directors, suspend the payment of all dividends, fire the family members, and issue all the authorized but unissued stock to himself in exchange for property of equal value. As the preferred shareholders died or attempted to transfer their stock to third parties, the corporation could purchase it, exercising the rights set forth

in the 1974 shareholders' agreement. Then the new common shareholder would approach each remaining preferred shareholder and offer to buy his stock at a certain price, "explaining that he did not intend to acquire all the Preferred Stock, but only enough to give it two thirds voting control. The risks of being a holdout and the prospect of eventual liquidation could also be politely explained." Rather than be the last preferred shareholder holding less than one-third of the total outstanding stock and having to accept the contractual liquidation value of $187.25 per share, Coffee believed that, in light of the advanced ages of Norman, Ted, and Mitzi, each preferred shareholder would be willing to sell his stock to the common shareholder quickly, or, alternatively, the preferred shareholders would acknowledge the futility of resisting and agree to a common sales price.

Siegel suggested more strongly coercive techniques for ousting the preferred shareholders such as selling off Advance assets for less than the highest market value either alone or in conjunction with a third party. Siegel indicated that it might not be necessary to actually engage in such transactions because it might be enough to "vaguely and darkly threaten such tactics to maximize the pressure on the Preferred Stock's holders." Time, Siegel concluded, would be on the side of the common shareholder because three of the preferred shareholders were elderly. Coffee also opined that the 1974 shareholders' agreement makes it inevitable that ultimately the corporation will be able to acquire all of the preferred stock and that preferred shareholders would choose to sell their stock to the corporation rather than risk having to accept liquidation value of $187.25 per share. Coffee noted that once the shares had been reacquired by the corporation, they could be issued to the common shareholder without invoking preemptive rights which do not apply to treasury shares under New York law.

Petitioner's experts explained that a buyer of the Advance common stock would be very unsure of his rights and powers to effect the major corporate restructuring and of the rights of the preferred shareholders to block his efforts. Angered preferred shareholders would bring legal action seeking either injunctive relief or the recision of the

transaction. Further obfuscating any predictable outcome of litigation, the experts disagreed on whether a New York court would entertain parol evidence of the understandings of the Newhouse family members about the relative rights and powers of shareholders or how much weight the court would give it. Lipton noted that faced with legal uncertainty of such magnitude, a buyer would insist on indemnification and other protections against the claims of the preferred shareholders. An indemnification provision would depress the value the hypothetical willing seller would receive.

Petitioner's experts believed that a buyer of the common stock who cannot also purchase the preferred stock would be in a precarious situation. The report from Cravath, Swaine & Moore described the situation as analogous to:

the relationship between a person who owns a house surrounded by someone else's land and the surrounding landowner. * * * neither the holders of the Preferred Stock nor the holders of the Class B Common Stock have an easement to realize the full value of their interests in the Company, but the holders of the Class A Common Stock have no right to that portion of value of the Company attributable to the interests of the holders of the Class B Common Stock and Preferred Stock.

*Analysis*

Initially we must resolve whether we need to determine the relative rights and preferences of the two classes of Advance stock. Petitioner contends that to discern what a hypothetical willing buyer would be willing to pay for the common stock we need only determine that there is substantial uncertainty among respected legal experts about the rights and powers of the classes of stock and about the extent of the common shareholder's authority over the corporate assets. Petitioner argues that this uncertainty will strongly influence the willing buyer's purchase offer. Petitioner contends that we do not need to decide whether a common shareholder would succeed or fail in eliminating the claims of the preferred shareholders, but only that the willing buyer could not be secure about his ability to do so and would offer a commensurately lower price for the stock.

Respondent counters that we must first decide whether, in fact, the common shareholder could ultimately secure complete control over the assets of Advance through any

one of the methods suggested by his expert witnesses. Respondent maintains that we cannot rule on the value of the common stock without first deciding the common shareholder's rights.

The focus of a valuation inquiry, however, is on the existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in determining a selling price. We agree with petitioner that it is the likely understanding of the rights and privileges of the Advance common stock that will influence the terms of sale, not whether we resolve this dispute over New York law. Indeed, we believe that it would be error to postulate a certainty that did not exist. Any potential buyer would be investing millions of dollars in this acquisition. Such a buyer would not assume legal certainty in the face of divided legal counsel.[21]

To decide the exact rights and powers of the Advance common stock under New York law, we would have to decide that a willing buyer would ignore or discount some of the expert advice we heard. We believe that we cannot, however, disregard the effect of the mixed legal advice on the hypothetical willing buyer's commitment of funds to a purchase price. Not only would our resolution of this issue not make the hypothetical willing buyer feel secure on February 29, 1980, it would distort the reality in which the fair market value must be determined.

A hypothetical willing buyer would have had the counsel of several advisers of formidable reputation: Landau & Lipton, noted corporate lawyers; Professors Coffee, Cox, Eisenberg, and Brudney and Deans Mundheim and Siegel, all affiliated with prestigious educational institutions. He could have read legal memoranda from White & Case and Cravath, Swain & Moore, well-respected law firms. The hypothetical willing seller would also have been aware of this conflicting legal advice and the uncertainty of obtaining economic dominance in Advance. Not only is the law disputed, but the experts cite substantially the same cases to support their diametrically opposed positions. Moreover,

---

[21]We struck from evidence the valuation report of one of respondent's experts precisely because he assumed legal certainty (i.e., that respondent's legal experts were correct) where none existed. Having made this flawed assumption, his report became irrelevant. See *Estate of Hall v. Commissioner,* 92 T.C. 312, 338-339 (1989).

no expert's views were patently unreasonable. No willing buyer, faced with the conflicting arguments and opinions of these respected legal experts could choose which one is right. The legal uncertainty will strongly affect his decision on the value of the common stock. "[T]he Court must not 'permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical buyer.'" *Estate of Hall v. Commissioner,* 92 T.C. at 337, citing to *Estate of Curry v. Commissioner,* 706 F.2d 1424, 1429 (7th Cir. 1983). To assume the correctness of the views of either respondent's or petitioner's legal experts would distort the facts in which a willing buyer would have negotiated the purchase and would result in a transaction plainly contrary to the buyer's economic interests.

In arguing that we must decide that one side or the other is right, respondent relies on several cases that are not directly applicable to the case at hand. In *Estate of Bright v. United States,* 658 F.2d 999 (5th Cir. 1981), the parties did not dispute the proper treatment of a decedent's community property under Texas law. In *Estate of Watts v. Commissioner,* 823 F.2d 483 (11th Cir. 1987), the process and implication of the dissolution and liquidation of a partnership under Oregon law was clear and easily resolved. In *Estate of Reynolds v. Commissioner,* 55 T.C. 172 (1970), the Government urged this Court to overlook restrictions on stock imposed by a voting trust. Although we concluded that the voting trust restrictions would "most likely be valid," we decided that the threat of the enforcement of the voting trust restrictions would be significant in itself to a potential investor. 55 T.C. at 193-194. Two of these cases involve legal disputes capable of fairly ready determination. In the other, the actual resolution of the State law question was deemed unnecessary and supports our approach here.[22]

In this case, the State law question cannot be resolved short of actual litigation subsequent to an actual purchase. The one certainty that the willing buyer would confront, which the willing seller would also have to take into account, is that with the State law issues as difficult to

---

[22]See also *Estate of Mundy v. Commissioner,* T.C. Memo. 1976-395 (validity of redemption provisions under Florida law were not necessary to evaluate effect of redemption provisions on prospective purchaser of restricted stock).

resolve and as fiercely contested as the relative rights and privileges of the Advance stock, there would be litigation. It would be nonsensical to believe that the preferred shareholders would not try to vindicate their economic interests.

## B. *Valuation Opinions*

Petitioner approached the willing buyer, willing seller test by soliciting the expert advice of investment bankers who daily counsel clients that buy and sell stock in businesses like Advance. Petitioner's experts evaluated the Advance common stock as if they were giving advice to a client, reviewing the advantages and the disadvantages that a client would face. Then, analyzing benchmark values for several approaches to selling the Advance common stock and relying on their experience and judgment, petitioner's experts determined a likely sales price.[23]

Respondent approached the valuation of Advance very differently. Respondent's theory of valuation takes the sum of the value of the Advance's assets in excess of certain planned expenditures and certain liabilities, and reduces that sum by a value attributable to the presence of the preferred stock. The remainder represents the value of the common stock and the price that respondent believes a willing buyer would pay to a willing seller. Several portions of respondent's expert's report were stricken from the record because they were based on an assumption without foundation. Specifically, Baniewicz based his analysis on the assumption that the value of the Advance common stock would be determined by subtracting from the value of the entire company the value of the preferred stock (the subtraction method).

None of respondent's expert witnesses testified that they would have advised a willing buyer to use the subtraction method in deciding the value of the stock. None could testify that they had ever advised the use of the subtraction method in advising buyers or sellers of closely held stock in any comparable situation.

---

[23]On brief, respondent argues that Goldman Sachs' approach only explores what a willing buyer would pay for the Advance common stock and should therefore be disregarded. What respondent has failed to see is that the highest price a willing buyer would pay is also the price that a willing seller wants.

## 1. *General and Industry Economic Conditions*

The period immediately preceding the valuation date was characterized by economic gloom. The economy was in a state of near-recession with high interest rates and high inflation. The newspaper and magazine publishing industry reflected the nation's troubles. Costs were high, competition increasing, and circulation and advertising revenues at a standstill or decreasing. A willing buyer and a willing seller would be aware of these economic conditions as they negotiated their price for the Advance common stock.

Respondent's expert witness, Baniewicz, found that the prognosis for the newspaper and magazine publishing industry was not as grim as we have found it to be. Although he agreed that the economy as a whole was not robust in late 1979 and early 1980, he stated that total advertising revenues rose in 1978 and 1979 and that the percentage of total U.S. advertising that was devoted to newspaper advertising decreased only slightly. Baniewicz' revenue figures, however, were not adjusted for inflation. Because classified advertising remained strong in 1978 and 1979, Baniewicz believed that no one expected that the impact on the publishing industry of the projected 1980 recession would be serious. Baniewicz also noted that magazine circulation grew in 1978 but leveled off in 1979. He further surmised that because magazine readers tend to have higher incomes, and because that demographic segment was expected to grow in 1980, the long-term outlook for growth in the magazine publishing industry would have been positive. We have concluded that Baniewicz' findings at best represent a few isolated bright spots in an otherwise gloomy economic picture.

## 2. *Competitive Position*

In order to compare Advance's financial strength and performance in relation to others in the industry, Goldman Sachs chose eight companies whose business mixes would be meaningfully comparable to Advance.[24] Relying on data from these eight companies, Goldman Sachs concluded that

---

[24]These eight companies were: Affiliated Publications, Inc., Dow Jones & Co., Gannett Co., Knight-Ridder Newspapers, Inc., Media General, Inc., The New York Times Co., The Times Mirror Co., and The Washington Post Co.

because Advance's earnings were already within the range of the industry norm for large publicly held companies, Advance's historical profit was reasonably indicative that its earning capacity had been fully achieved. Goldman Sachs noted that Advance paid relatively low dividends, although there were sufficient earnings to pay considerably more. Furthermore, Goldman Sachs determined that Advance retained a high cash balance relative to comparable businesses. Advance also had $145 million for planned extraordinary capital expenditures at the date of valuation. Goldman Sachs' comparison shows that Advance had relatively high operating income and net income and exceptionally low long-term debt in 1979.

### 3. *Size of Advance and Legal Uncertainty*

As the Chemical Bank report explained, a willing buyer's business judgment in valuing the Advance common stock would be formed in large part by the uncertainty of the common's power to defeat the preferred's claim to 78 percent of dividends:

The possibility that any speculative buyer's attempt to deny the preferred shareholders what they believed to be the fair value of their shares would fail makes it extremely unlikely that any such buyer would have risked the enormous capital required to buy the Common Stock based on such speculation * * * .

Because of the millions of dollars needed to buy the common stock of Advance, the prevailing high interest rates, and the inevitability of litigation (aside from the possibility of failure), no one would have been willing to make such a speculative investment in early 1980 at a price determined by respondent's subtraction method. Goldman Sachs believed, and we agree, that the uncertainty inherent in purchasing only the common stock combined with the enormous investment required would depress the price that any buyer would offer. Goldman Sachs explained further the effect of fiduciary duties to the preferred shareholders on any buyer's judgment on the value of the common stock: "most acquirers want the ability to enter into transactions, with affiliates or otherwise, without being challenged as to the fairness of those transactions to non-controlling shareholders."

McCorkindale, vice president of Gannett Corp., stated that Gannett would not be interested in a purchase of the Advance common stock, unless the preferred stock were also available. Gannett, he explained, generally avoided purchases of less than 100 percent of the outstanding stock. McCorkindale was also concerned that the Advance common shareholder would have fiduciary responsibilities toward the preferred shareholders. Murdoch, chief executive officer of The News Corp., agreed that the Advance common stock would not be attractive because of the existence of the preferred shareholders.

### 4. *Antitrust and FCC Difficulties*

J. Paul McGrath, a partner of Dewey, Ballantine, Bushby, Palmer & Wood, specializing in the antitrust ramifications of mergers and acquisitions, testified on behalf of petitioner. McGrath stated that any media company large enough to buy Advance would have overlapping markets and would need to divest itself of some of its holdings.

Murdoch agreed that purchasing Advance was made less desirable by "various Justice Department and Federal Communications Commission restrictions."

McCorkindale explained that if Gannett had purchased the Advance common stock, Gannett would have had several newspaper properties in overlapping markets. Furthermore, in contemplating an acquisition, McCorkindale also considers long-term anticipated expansion into new markets. Owning one of Advance's newspaper properties might preclude the buyer from later purchasing a competing newspaper that was more desirable.

### 5. *Accounting Problem*

The parties disagreed about how the purchaser of Advance's common stock would account for the earnings of Advance on its books. Petitioners introduced the testimony and report of Abraham Briloff, a certified public accountant and Professor Emeritus of Baruch College, and Ronald J. Murray, a certified public accountant and a partner with the accounting firm of Coopers & Lybrand.

Briloff stated that pursuant to generally accepted accounting principles, a corporate owner of the common stock

interest in Advance could report in consolidated earnings only Advance's earnings and profits attributable to the common stock and no amount attributable to the preferred stock interests. Murray and Briloff agreed that a corporate owner could report only 22 percent of Advance's earnings on its consolidated financial income statement.

Contradicting the reports of Murray and Briloff, respondent introduced the report and testimony of Gustav A. Gomprecht, a certified public accountant and a retired partner of KMG Main Hurdman. Gomprecht, in his prepared report and on direct examination, concluded that the financial statements of the buyer of Advance's common stock could include all of Advance's net income. Gomprecht based his view in part on his belief that the common shareholder could represent that, until dividends were paid out of earnings, the shareholder was entitled to all earnings. Gomprecht conceded on cross-examination that if the common shareholder included the earnings of Advance in its financial statements without at least a footnote stating that 78 percent would have to be distributed to the preferred shareholders when declared, those financial statements would be misleading.

In the end we believe that Briloff and Gomprecht came to the same conclusion. Once Advance declares a dividend from earnings, retained or current, 78 percent would be distributed to the preferred shareholders. The holder of the common stock would be entitled to no more than 22 percent, and if the buyer's financials suggested entitlement to more, they would be misleading. Given the size of Advance's earnings, it is likely that such a misstatement would be material.

### 6. *Valuation Analyses*

#### a. *Goldman Sachs' Valuation*

In valuing the Advance common stock, Goldman Sachs applied the methods it uses daily to advise buyers and sellers of stock and securities. First, Goldman Sachs assessed four benchmarks of value that a prospective buyer of Advance would consider. These benchmarks would be used to ascertain the correct value of Advance by a buyer for analytical purposes but are not determinative of the value

of the common stock. The four benchmarks are: (1) The public trading market value, i.e., the value if Advance stock had been actively traded on the stock market; (2) the initial public offering value, or the net value realizable by the shareholders who first introduce Advance stock on the public stock market; (3) the possible merger market value, or the amount realized by the shareholders if they sold all their stock to one party in a private sale; and (4) the arithmetic sum value, or the sum of the values of each of the assets if sold in independent transactions.

Goldman Sachs concluded that the public trading value for Advance as of February 29, 1980, was $905 million. At that time the stock market indices were declining and media companies were lagging behind the market. Goldman Sachs evaluated eight businesses that were active in the media industry and comparable to Advance in business mix.[25] Advance placed near the middle of these companies in overall financial performance. Furthermore, though Advance was well managed, Goldman Sachs believed the public market would have disapproved of Advance's concentration in newspapers, particularly evening newspapers, and magazines at a time when other media companies were diversifying into television. Goldman Sachs estimated a price-earnings multiple of approximately 9.4 times earnings or $905 million.

Goldman Sachs also determined that the initial public offering value for Advance on February 29, 1980, was $778 million. Ordinarily the price at the initial public offering would be subject to a discount of between 5 and 10 percent below the anticipated price once the stock is established on the market. There is an additional underwriter's gross spread discount of about 7 percent. These two discounts applied to $905 million produced $778 million. An initial public offering of all the Advance stock would have been more than 20 times larger than any initial public offering for several years preceding February 1980. The magnitude

---

[25]On brief, respondent objected to Goldman Sachs' choice of the eight comparable businesses on the grounds that Advance's unique capital structure set it apart from those eight corporations. Respondent failed at trial to introduce evidence (whether on cross or through direct examination of his own witnesses) that would suggest any lack of merit in using these businesses as comparables. Moreover, respondent's own expert, Baniewicz, used four of those businesses as comparables (Gannett Co., Knight-Ridder Newspapers, Inc., The New York Times Co., and The Times Mirror Co.) to evaluate Advance's financial position.

of the offering would have further lowered the realizable value.

Although Goldman Sachs decided that practically it would be difficult to arrange a merger of Advance, they determined that if there was a merger the shareholders could have realized between $1.1 and $1.2 billion. Although the merger market for small newspaper companies was flourishing around February 1980, Advance was already efficiently managed and a prospective buyer would not have believed that he could quickly and easily improve the operating margins or increase the revenue. Furthermore, the size of Advance would have daunted all but the largest prospective buyers. For these and other reasons, both Goldman Sachs and Chemical Bank could not find any comparable historical mergers by which to measure the merger value of Advance. Additionally, neither the general economic conditions nor the newspaper publishing industry were conducive to a major acquisition.

Finally, Goldman Sachs computed the arithmetic sum value of $1.5 billion by assuming that each of Advance's properties was sold independently. Although unlikely in a real market situation, Goldman Sachs assumed for the purposes of the report that the purchase prices realized would be unaffected by the simultaneous sale of all of the other properties.[26] After reviewing the economic conditions' effect on the value of newspaper properties, Goldman Sachs evaluated each of Advance's assets. Goldman Sachs considered the local economies and demographic pictures for each newspaper and compared the Advance advertising and circulation trends to those of other newspapers. They also considered the individual newspaper properties from the point of view of the mergers and acquisitions market.

The sale of all of Advance's newspaper and magazine properties at one time would have had a seriously depressing effect on the market for such properties. Furthermore, in order to avoid significant tax consequences, the sale of

[26]Respondent complained on brief that Goldman Sachs' arithmetic sum value represented future income potential to the exclusion of current asset value. This is due, in part, to Goldman Sachs' analysis of the newspaper properties as going concerns, in contrast to Baniewicz' liquidation value approach. Nonetheless, because Goldman Sachs and Baniewicz ultimately came very close to agreeing on the aggregate value of the newspaper properties, we do not believe that this discrepancy is worth further consideration.

all of the properties would have to be accomplished within 1 year. In light of the difficulties, Goldman Sachs concluded that its arithmetic sum value was not realistic.

Keeping in mind their four benchmarks of value for Advance's entire business, Goldman Sachs then turned to a discussion of the possible types of buyers for the Advance common stock. The report contemplated four types of investors: (1) The passive investor, (2) the active investor, (3) the control investor, and (4) the public.

A passive investor would not be interested in managing Advance and would not attempt to wrest control from management. Expecting to realize value from dividends and private resale, the passive investor would not expect to extract value from Advance through liquidation, merger, or public offering. The passive investor would consider that Advance's stock was not publicly traded which would depress expectations of resale value. Due to this illiquidity, lack of control, and the uncertainties and constraints affecting the purchase, Goldman Sachs concluded that the passive investor would have offered 30 percent less than the public trading market value of the common stock and thus only $141 million for the common stock.

The active investor would be inclined to pursue action, short of seeking control, that would quickly maximize the return on his investment. One course of action would be to declare a dividend of Advance's excess cash and any funds that could be obtained through borrowing. Because of the high prevailing interest rate and planned capital expenditures, the common shareholder could extract no more than $74 million of excess cash plus loan proceeds. Advance also had $145 million of excess cash which could be distributed with the loan proceeds. Because of the time and uncertainty involved in this plan of action, the active investor would pay no more than 85 percent of the amount he hoped to extract. This figure would be far less than the $141 million the passive investor would be willing to pay.

Alternatively, the active investor might cause the excess cash to be distributed immediately and then cause Advance to pay dividends at the highest possible level. Assuming that the active investor would insist on an after-tax yield on his investment of about 13 or 14 percent, Goldman Sachs

concluded that the active investor would be willing to pay $150 million for the Advance common stock.

A control investor would have purchased the Advance common stock with the goal of acquiring 100 percent of the equity ownership and control of the company. A control investor would hope to realize value from his purchase by dividend distributions, by liquidation, or by merger, but Advance's unusual capital structure would prevent the latter two courses of action without eliminating the preferred stock or securing their consent. The preferred had the right to block liquidation. Because the common's power to effect a merger adverse to the preferred's interests was so uncertain, Goldman Sachs concluded that any willing buyer, as a matter of sound business judgment, would analyze the value of the common as if that option were foreclosed. Goldman Sachs' analysis is persuasive.

Goldman Sachs concluded that only another media company would be interested in acquiring Advance and that none of the major media companies would have considered buying the common stock without first eliminating the claims of the preferred shareholders. Because the control investor would assume that he could not receive anything except 22 percent of the highest level of dividends declared, he would be in the same position as the active investor and would pay no more than what the active investor would pay, viz, $150 million.

Goldman Sachs concluded that an underwritten public offering would be the best way to sell the Advance common stock, requiring the three different types of stock to be recapitalized into a single class. Goldman Sachs' research indicated that in approximately half of the transactions in which voting control was transferred the buyers paid a premium for control. Goldman Sachs concluded that no control premium was warranted. Goldman Sachs then determined that, after exchanging the class A common stock one for three, and the class B common and the preferred stock one for one, the offering price would be $25 per share subject to a 7-percent discount. The price for all the shares would be $778 million, and for petitioner's shares it would be $176 million.

Because the benchmark value for a public offering, $176 million, was the highest value, Goldman Sachs concluded that the value of petitioner's Advance common stock was $176 million on February 29, 1980.

b. *Chemical Bank's Valuation*

Chemical Bank applied two analytical approaches: (1) A discounted cash-flow analysis, and (2) a comparison with the financial performances of publicly traded companies in a similar line of business. Chemical Bank did not use a break-up value analysis because it believed a buyer in early 1980 could not have maximized the return on his investment by liquidating Advance and selling off its assets. Chemical Bank declined to employ acquisition multiples (information relating to mergers and acquisitions) because there were no acquisitions of publishing businesses of Advance's size and complexity between 1975 and 1980, and Chemical concluded that other acquisitions were not sufficiently similar to be meaningful.

After calculating a value for Advance as a whole, Chemical Bank derived appropriate discounts and premiums and computed a value for petitioner's Advance stock. Based on Advance's financial data from the preceding 5 years, Chemical Bank projected the future cash-flow for the next 10 years and discounted it back to 1979 in order to determine the net present value of Advance. In forecasting the future growth of Advance, Chemical Bank used a growth rate of 10 percent, which was the rate that Advance had experienced prior to the date of valuation. A discount rate for the risk of the investment of 18 or 19 percent was applied. Under the discounted cash-flow model, Chemical Bank figured that Advance was worth between $738 and $814 million.

Chemical Bank chose eight newspaper or magazine publishers and compared them to Advance by earnings, book value, cash-flow, earnings before interest and taxes, and earnings before depreciation, interest, and taxes. These comparisons revealed a range of value for Advance between $854 and $926 million.

Chemical Bank assumed a worst-case scenario for the potential buyer's consideration of realizable value, viz, that

the right to 22 percent of declared dividends was the common shareholder's sole method for extracting cash from the corporation. Using the midpoint number from the range of value produced by the discounted cash-flow analysis and the comparable businesses analysis, Chemical Bank computed that the Advance common stock was worth 22 percent of $906 million or $201.31 million. Chemical Bank applied a control premium of 7 percent to the class A common shares over the class B common shares. Finally, a 15-percent discount for lack of marketability was applied. Chemical Bank valued the Advance common stock at $1.831 million and $169.422 million for the class A common stock and the class B common stock respectively, or $171,253,000 altogether.

## c. *Baniewicz' Report*

Baniewicz valued all the properties owned by Advance on February 29, 1980, and derived a total value of $1,555,773,000. He subtracted foreseeable capital expenditures and unfunded pension liabilities and then added excess cash, arriving at a value of $1,505,943,000. Baniewicz' ultimate conclusion of the value of all of Advance thus agrees with the arithmetic sum value calculated by Goldman Sachs.

Baniewicz' report went on to place a value on the preferred stock and to reach a value for the common stock by subtracting the value of the preferred from the value of Advance. Cf. Rev. Rul. 83-120, 1983-2 C.B. 170. Finally, he allocated the value he determined for the common stock between the class A common and the class B common.

The section of Baniewicz' report that discussed the value of the preferred stock was stricken from the record. The report was based on two erroneous assumptions unsupportable on this record: (1) That the preferred stock enjoyed only those rights and privileges that respondent's legal experts said it did (a best-case scenario), and (2) that a willing buyer and willing seller would have approached the valuation of the Advance common stock by determining the net value of all assets and subtracting the value of the preferred stock.

The hypothetical willing buyer is presumed to be aware of all the pertinent facts. Such a buyer would be privy to the differing legal opinions on the common shareholder's ability to defeat the claims of the preferred shareholders to 78 percent of Advance's earnings. We do not believe that a willing buyer would have chosen to ignore the legal advice of petitioner's five legal experts. A fully informed buyer would not have assumed the correctness of the advice of respondent's five legal experts. We, therefore, cannot accept Baniewicz' underlying assumptions about the rights and privileges of the preferred stock. Rather, the record makes clear that any willing buyer would have considerable uncertainty about the common shareholder's rights to confine the preferred stock's interest in Advance to less than 78 percent of the value of Advance. Because Baniewicz' report assumes a confident willing buyer, certain that the preferred shareholders' right to 78 percent of declared dividends can be defeated, who is unmoved by the warnings of petitioner's legal experts, this portion of his analysis assumed a transaction at odds with the economic interest of any buyer. Consequently, this portion of his report was not useful to us and was stricken from the record. *Estate of Hall v. Commissioner,* 92 T.C. 312, 338-339 (1989).

The other problem with Baniewicz' report was his use of the subtraction method for valuing the Advance common stock. Although the subtraction method may on occasion be an appropriate valuation method, some foundation for applying the subtraction method to a corporation whose capital structure is as unusual and complicated as Advance's is necessary. Respondent had to establish that the subtraction method was appropriate to valuing Advance. While Baniewicz was on the stand, respondent's counsel promised that two of his subsequent witnesses would testify that in their experience (Baniewicz had no qualifying experience on this point), a willing buyer would use the subtraction method to value the common stock in Advance. In fact, their proffered testimony fell far short and was ultimately stricken from the record as irrelevant. As a result, Baniewicz' employment of the subtraction method was not meaningful. Without the subtraction method,

Baniewicz' report says nothing more than that the sum of the values of all of the assets of Advance was $1.5 billion.

*Conclusion*

The first issue we must resolve is whether the parties correctly applied the willing buyer, willing seller test to these facts. Each party accuses the other on brief of adopting a rigid formulaic analysis that does not do justice to the complexity of this factual situation. *Hamm v. Commissioner*, 325 F.2d 934, 940 (8th Cir. 1963).

The choice of the appropriate valuation methodology for a particular stock is, in itself, a question of fact. *O'Malley v. Ames*, 197 F.2d 256, 258 (8th Cir. 1952); *Riss v. Commissioner*, 56 T.C. 388, 430 (1971), affd. sub nom. *Commissioner v. Transport Mfg. & Equipment Co.*, 478 F.2d 731 (8th Cir. 1973), affd. cause remanded 478 F.2d 1160 (8th Cir. 1973).

Goldman Sachs analyzed four benchmarks of value that willing buyers use to determine the value of stock to be purchased, and Chemical Bank valued Advance by utilizing discounted cash-flow and Advance's comparative position. These represent perfectly acceptable applications of the willing buyer, willing seller test. Respondent, however, failed to qualify any expert who could testify that a willing buyer and a willing seller would value the Advance common stock using the subtraction method. Moreover, in the face of the legal uncertainty confronting a willing buyer and willing seller on whether the common could limit the preferred's 78-percent interest in dividends and perhaps in the value of the whole business, we believe that no willing buyer or willing seller being fully informed would have used such a method to determine the value of the common stock. Respondent has no support for using the subtraction method.

Respondent faults petitioner for adhering inflexibly to a "joint sale" theory. Respondent characterizes petitioner's position as follows: because a third party contemplating a merger with Advance would be unsure of the common shareholder's rights to eliminate the claims of the preferred shareholders and would be highly averse to protracted and expensive litigation, the third party would not agree to the merger. Thus, the only way for the common shareholder to

realize value, other than through dividend distributions, would be to effect a merger transaction with the preferred shareholders' blessing. The terms of such a merger would require that 78 percent of the value of Advance would go to the preferred shareholders, and the common shareholder could not hope to get more than 22 percent of the total value of Advance.

We do not find any merit in respondent's attacks on petitioner's "joint sale" theory, and we note that respondent misstates petitioner's theory.[27] Petitioner's theory is that a fully informed willing buyer would take into account the uncertain state of the common stock's rights in deciding what value to pay for it.

Respondent argues that this theory is unsound for several reasons. First, respondent contends that the common shareholder would protect the third party by indemnifying it against any claims of the preferred. As noted above, however, an indemnification provision would simply allocate the risk from the third party to the common shareholder. It in no way lessens the risk itself; rather it lessens the value the seller may realize. Respondent's second argument, that corporations are not as risk averse as petitioner claims, is irrelevant because: (1) While a willing buyer may employ the corporate form to effect the acquisition, we do not assume that the willing buyer would be a corporation and, more importantly for this case, (2) it is an assertion completely without support in the record. Respondent then notes that because the preferred shareholders would immediately seek an injunction, the common shareholder and the third party buyer would not have to wait to find out if their planned defeat of the preferred's claims would work. We do not think that this would end the suspense because the outcome of the litigation is not clear to us. Respondent's fourth argument is that the preferred shareholders would settle the litigation for the capitalized value of future dividends. Obviously, they would not if they were represented by Messrs. Landau, Mundheim, or Lipton.

---

[27]Indeed it was one of respondent's experts that assumed that the willing buyer, willing seller test required the preferred shareholders to consent to the sale of all Advance stock. This testimony was stricken as fundamentally flawed.

The foundation of respondent's approach is his view that we must resolve the question of the various legal entitlements of the common and preferred stock in his favor. Respondent's position assumes that a willing buyer would not be uncertain about his ability to dispose of the claims of the preferred shareholders. In effect, respondent argues that a willing buyer would not hesitate to pay $1,231,800,000, as Baniewicz suggests, for the Advance common stock because of his ability to eliminate the preferred stock. This is an astonishing proposition on this record. Noted legal experts have given contrary views in this case. Petitioner's experts' opinions were unscathed by cross-examination. Their opinions were well reasoned and persuasive. We believe the likelihood of the common shareholder's legal rights to eliminate the preferred is, at best, in equipoise. The one thing the willing buyer would not have had is certainty about the ability to eliminate the preferred at the values that respondent used in his subtraction method.

Not only is there no support in the record for the subtraction method in this case, but we conclude that it is far too simplistic a method for the valuation of the Advance common stock. An underlying fallacy in this theory of valuation is the assumption that the sum of the fair market values of the preferred stock and the common stock, each sold independently to separate buyers, must equal the net value of the entire company as a going concern. Massive amounts of credible evidence in this case indicate that this assumption is not supportable.

If all the common and preferred stock in the company were sold at one time to a single buyer, we have little doubt that the price would approach the values that the experts on both sides determined for the business as a whole. But if either class of stock is sold separately, a buyer cannot be reasonably certain of his ability to eliminate or control the other shareholders, and the price will be less than its proportionate share of the total value. Although the subtraction method may be suitable for other situations, its use is inappropriate for Advance. We conclude that the correct value of the Advance common stock on February 29, 1980, was $176 million.

A subissue that we must address is the value of the 300 shares of class B common stock that Newhouse left to his wife by will. Petitioners submitted Goldman Sachs' report that states that the 300 shares of class B common stock were worth $51,757,576. Goldman Sachs calculated this figure by allocating $170,800,000 (of the value of the common stock, $176,000,000,) to the class B and $5,200,000 to the class A. This allocation was derived from Goldman Sachs' initial public offering analysis. Petitioner argues that, because the stock conveyed no control and because the value of the 300 shares of class B common stock must be determined without reference to any other stock Mitzi held, the correct value was $51,757,576. Petitioner also submitted an analysis of the value of the class B common stock by Chemical Bank. Chemical Bank determined the value of the 300 shares of class B common stock to be $51,340,000.

Respondent argues that the correct value of the 300 shares of class B common stock is $246 million. As support for this position, respondent relies on reports that were not admitted into evidence. The figure was derived by discounting his value for the class B stock by 33 percent for lack of control and substantial voting restrictions. Baniewicz' argument supporting his calculation allocating his figure for the total value of Advance common stock between the class A and the class B was not admitted into evidence.

We have already concluded that the combined value of class A and the class B is $176 million. Respondent argues that a 33-percent discount of the value of class A to reflect the differential voting rights is appropriate to find the value of the class B, but offers no evidence to support his position. We conclude that Goldman Sachs' analysis produces a reasonable and correct value for the class B stock. Goldman Sachs determined that the best way to realize the value in the Advance stock would be through a public sale. First, it would be necessary to recapitalize Advance creating a single class of common stock. Goldman Sachs determined that the preferred stock and the class B stock would be traded for equal amounts of the new stock but the class A common stock would be traded for three shares of the new stock. The value of the class A common stock was

$5.2 million and the value of the class B was $170.8 million. The value of 300 shares of class B common stock was $51,757,576.

## II. VALUE OF N.B. CO. COMMON STOCK

In the notice of deficiency, the value determined for the 100 shares of N.B. Co. stock was $91,600,000 which is simply 44.44 percent of $206,400,000. On brief, respondent argues Baniewicz' determination that a 16.67-percent "discount" would be appropriate.[28] Petitioner derives the value of $59,600,000 by applying a discount of 35 percent to the 44.44 percent block of stock. The sole dispute that we must resolve is whether a discount is appropriate and, if so, how large it should be.

Respondent's determination in the notice of deficiency, which he supported through the testimony of William B. Cate, is undeniably wrong. Ignoring discounts for lack of control and lack of marketability is contrary to long-established valuation methods well accepted by the Courts in cases presenting the value of stock in closely held corporations. *Estate of Andrews v. Commissioner*, 79 T.C. 938 (1982); *Estate of Bright v. United States*, 658 F.2d 999, 1002-1003 (5th Cir. 1981); *Estate of Leyman v. Commissioner*, 40 T.C. 100, 119 (1963). The discounts are conceptually distinct: (1) The discount for lack of control reflects the minority shareholders' inability to compel liquidation and inability to realize a pro rata share of the corporation's net asset value. *Harwood v. Commissioner*, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); (2) the lack of marketability discount reflects that there is no ready market for the shares of a closely held corporation. *Estate of Andrews v. Commissioner, supra* at 953. While the appropriate amount of discount to apply is a question of fact, *Ward v. Commissioner*, 87 T.C. 78, 109 (1986), it is unreasonable to argue that no discount should be considered for a minority interest in a closely held corporation.

---

[28]Baniewicz calculated that the value of the 100 shares would be $76,372,500. Respondent did not explain the discrepancy between his figure and Baniewicz' result.

A. *Goldman Sachs' Report*

Petitioner submitted a report in which Goldman Sachs determined that a willing buyer would pay a willing seller $59.6 million for the 100 shares of N.B. Co. common stock on February 29, 1980. In preparing the report, Goldman Sachs reviewed the corporate bylaws, the Certificate of Incorporation, and the financial statements from the preceding 5 years. Additionally, Goldman Sachs read the 1980 valuation report prepared by Chemical Bank[29] and the valuation report prepared by respondent's expert, Baniewicz.

Goldman Sachs concluded that the 100 shares of common stock, representing 44.44 percent of the stock, lacked voting control. In other words, this block of stock neither controlled management nor controlled cash flow or distributions. A buyer of the 100 shares would not have the power to sell corporate assets or to register the stock with the Securities and Exchange Commission preparatory to an initial public offering. Because the stock interest had no control over corporate affairs, Goldman Sachs concluded that a buyer of the stock would hope to realize the value from his investment when the stock was initially offered to the public.

Goldman Sachs believed that a public offering was unlikely. In view of the large size of the company, a public offering would not have been feasible under market conditions at the valuation date. Moreover, while N.B. Co. had in excess of $25 million in cash and virtually no debt, management had expressed no interest in taking the company public. Furthermore, N.B. Co. had, as of the valuation date, arranged to sell its five television broadcasting stations that generated more than half of N.B. Co.'s revenue and planned to reinvest the proceeds in new television broadcasting stations.

Because liquidation of the corporation was unlikely, Goldman Sachs concluded that the only means of disposing of the 100 shares of N.B. Co. common stock would be

---

[29]The 1980 valuation report of Chemical Bank was the basis of petitioner's claim on its estate tax return that the N.B. Co. stock was worth $68.3 million. For purposes of trial, however, the parties agreed to use $206.4 million for the value of the entire company and so petitioner discarded Chemical Bank's 1980 valuation.

through private placement. Because the 100 shares do not convey control over the company, no control premium would be warranted. The private placement investor would expect to realize value on his investment only through the receipt of dividends and the eventual resale of his shares. Goldman Sachs estimated the value of the future annual dividend income from the 100 shares at $889,000 based on historical dividends for 1978 and 1979. Although the corporation had the ability to pay higher dividends, the private placement investor would not have the power to compel it to do so. At the valuation date, publicly traded corporate bonds were yielding 14 and 15 percent and a buyer would not have accepted a lower rate of return on his investment from his N.B. Co. stock. Additionally, Goldman Sachs determined that in circumstances that suggest no expectation of a public offering for at least 5 years, the investor would not pay more than the total value discounted by between 33 to 55 percent. Goldman Sachs concluded that a discount of 35 percent would be appropriate to the N.B. Co. common stock. Applying a discount of 35 percent to 44.44 percent of the total value of N.B. Co. of $206.4 million, Goldman Sachs derived a fair market value for the 100 shares of common stock of $59.6 million.

## B. *Baniewicz' Report*

Baniewicz determined that the 100 shares of stock would bear a control premium because, though 44.44 percent was not a majority interest, it was the "largest outstanding ownership interest" and thus "would participate in decisions controlling the affairs of the corporation." Because the stock did not represent a majority interest, Baniewicz concluded that a 25-percent control premium, rather than a full 50-percent control premium, was warranted. In order to attain a 25-percent control premium, Baniewicz applied a 16.67-percent discount from full liquidation value of $206.4 million because the liquidation value included a 50-percent control premium that had to be reduced. Thus, Baniewicz' 16.67-percent discount is actually a reduced control premium.

We cannot accept respondent's position. Control means that, because of the interest owned, the shareholder can

252

unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets. The owner of the 100 shares of N.B. Co. could not accomplish any of these actions. Baniewicz explained at trial that the owner of the 100 shares would have effective control because he would have the largest block of stock. Having a substantial or even the largest block of stock does not necessarily create effective control, and it certainly does not in this closely held corporation. The owner of the 100 N.B. Co. shares enjoys no attributes of control. Participating in corporate decisions is a right that any stock interest may enjoy (and which in this case the other stock interests also enjoyed), but unless that interest controls (which in a closely held corporation typically means a majority interest), a control premium is unsupportable.

We conclude that petitioner's position, as explained in the Goldman Sachs report, is reasonable and fair. The discount of 35 percent combines discounts for lack of control and lack of marketability. A combined discount of 35 percent is well within precedent. See *Estate of Watts v. Commissioner*, T.C. Memo. 1985-595, affd. 823 F.2d 483 (11th Cir. 1987); *Drybrough v. United States*, 208 F. Supp. 279 (D. Kan. 1962).[30] We conclude that the value of the 100 shares of N.B. Co. stock was $59,600,000 on February 29, 1980.

In light of the foregoing, concessions, and the need to calculate various administration expense deductions,

*Decision will be entered under Rule 155.*

---

[30]See also *Martin v. Commissioner,* T.C. Memo. 1985-424.