T.C. Memo. 1999-254


UNITED STATES TAX COURT


WALTER L. GROSS, JR., AND BARBARA H. GROSS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CALVIN C. LINNEMANN AND PATRICIA G. LINNEMANN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 4460-97, 4469-97.          Filed July 29, 1999.

♦


     Ps made gifts to their children of shares in
S corporation, which, annually, distributed
substantially all of its income.  R determined gift tax
deficiencies based on adjustments increasing the fair
market value of the shares.  Principal differences
between the parties are (1) whether to "tax affect"
corporation's earnings in determining discounted cash-
flow, (2) the discount for lack of marketability, and
(3) the cost of equity.
     <u>Held</u>:  Value of shares determined; marketability
discount and cost of equity determined; tax affecting
inappropriate under facts presented.


<u>James J. Ryan</u> and <u>Gerald J. Rapien</u>, for petitioners.

<u>Robin Herrell</u> and <u>Matthew Fritz</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These cases have been consolidated for
trial, briefing, and opinion.  By notices of deficiency dated
December 16, 1996, respondent determined deficiencies in Federal
gift taxes as follows:

| Docket Number | Petitioner | Year | Deficiency |
|---|---|---|---|
| 1460-97 | Walter L. Gross, Jr. | 1992 | $584,139 |
| 1460-97 | Barbara H. Gross | 1992 | 584,140 |
| 1469-97 | Calvin C. Linnemann | 1992 | 581,605 |
| 1469-97 | Patricia G. Linnemann | 1992 | 582,807 |

Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

The common question presented by these consolidated cases is
the July 31, 1992, fair market value of certain shares of
corporate stock transferred by gift by petitioners Walter L.
Gross, Jr. (Walter Gross), and Patricia G. Linnemann (Patricia
Linnemann) to their respective children.  Petitioners Barbara H.
Gross (Barbara Gross) and Calvin C. Linnemann (Calvin Linnemann),
the wife and husband of Walter Gross and Patricia Linnemann,
respectively, are petitioners because they and their respective
spouses consented to having the gifts made by each spouse
considered for Federal gift tax purposes as having been made

one-half by each spouse. Respondent initially determined that each share of stock in question had a value of $11,738, but now concedes that each such share has a value of no more than $10,910. Petitioners based their gift tax liabilities on a value of $5,680, which they maintain is the correct value.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time of the filing of the petitions, all of the petitioners resided in Cincinnati, Ohio.

G&J Pepsi-Cola Bottlers, Inc.

The shares of stock in question are shares of G&J Pepsi-Cola Bottlers, Inc. (G&J), an Ohio corporation formed in 1969. The business operations of G&J can be traced to a business conducted by a partnership formed in the 1920s between two married couples, Isaac N. and Esther M. Jarson and Walter L. and Nell R. Gross (the founders). By 1992 (the year of the gifts here in question), the founders had died, and ownership of G&J had devolved to certain relatives of the founders, viz, the Gross family group (which included members of the Linnemann family) and the Jarson family group. In 1992, directly and through voting

trusts, each family group owned 50 percent of the outstanding shares of stock of G&J.

In 1982, G&J elected to be taxed as a "small business corporation" (an S corporation), within the meaning of section 1371 of the Internal Revenue Code of 1954. By agreement dated November 1, 1982 (the S corporation agreement), the shareholders of G&J agreed to maintain G&J's status as an S corporation for at least 10 years. G&J, in fact, maintained its S corporation status through July 31, 1992, at which time there were no plans to change its S corporation status. Further, an agreement restricting the transfer of the G&J shares by and among the members of the Gross family group (the Gross family restrictive transfer agreement), dated October 29, 1982, also remained in effect as of July 31, 1992.[1] The Gross family restrictive transfer agreement contained express provisions to prevent termination of G&J's S corporation status. As of July 31, 1992, G&J had issued an outstanding 19,680 shares of common stock without par value.

In 1992, G&J's top management positions and voting control were largely in the hands of the senior members of the Gross and Jarson family groups. The shareholders of G&J got along well,

---

[1] There was a similar restrictive transfer agreement by and among the members of the Jarson family group holding shares of G&J dated Apr. 1, 1983, which also remained in effect as of July 31, 1992.

and they did not allow differences in their business philosophies to interfere with the successful operation of the corporation. None of G&J's shareholders was interested in selling his or her shares.

In 1992, G&J bottled and distributed various soft drinks, including Seven-Up, Dr. Pepper, and five variations of Pepsi-Cola. Through franchise agreements with PepsiCo, Dr. Pepper, and Seven-Up, G&J had the exclusive right to bottle and distribute the various soft drinks it produced within several geographic territories. G&J was a well-managed company in 1992. It was the third-largest independent Pepsi-Cola bottler. G&J owned most of the real estate associated with its plants and warehouses. It owned in excess of 800 vehicles, including tractors, trucks, and trailers. Additionally, G&J owned about 11,400 soft drink vending machines. G&J sold the soft drinks it produced to supermarkets, convenience stores, mass merchandisers, gas mini-marts, drugstores, vending companies, restaurants, bars, lunch counters, and concessions. In 1992, it had approximately 24,000 customers.

From 1988 through 1992 there were steady increases in G&J's operating income, total income, and distributions to shareholders. During that period, distributions to shareholders nearly equaled the company's entire income, as shown below:

| Fiscal Year Ended | Operating Income | Other Income | Total Income | Shareholder Distributions |
|---|---|---|---|---|
| 1988 | $15,680,903 | $2,050,232 | $17,731,135 | $17,778,483 |
| 1989 | 18,150,034 | 1,329,796 | 19,479,830 | 19,458,148 |
| 1990 | 21,623,537 | 2,323,068 | 23,946,605 | 24,032,651 |
| 1991 | 23,796,119 | 542,321 | 24,338,440 | 24,126,041 |
| 1992 | 23,258,506 | 4,327,367 | 27,585,873 | 28,188,889 |

Petitioners' Gifts

On July 31, 1992, Walter Gross made a gift of 124.5 shares of common stock in G&J to each of his three children (together, the Walter Gross gifts). Each of the Walter Gross gifts represented 0.63 percent of the issued and outstanding shares of G&J. Walter and Barbara Gross (the Grosses) each reported one-half of the amount they determined to be the value of the Walter Gross gifts on a timely filed Form 709, United States Gift (and Generation Skipping Transfer) Tax Return (Form 709). In determining (and reporting) the value of the Walter Gross gifts, the Grosses relied on an appraisal report prepared by Business Valuations, Inc. (the Business Valuations report and Business Valuations, respectively), dated July 22, 1992, valuing shares of G&J's common stock as of May 31, 1992, at $5,680 a share. Since the Grosses used a value of $5,680 a share, the total reported value of the Walter Gross gifts was $2,121,480.

On July 31, 1992, Patricia Linnemann made a gift of 187.5 shares of common stock in G&J to each of her two children (the Patricia Linnemann gifts). Each of the Patricia Linnemann gifts

represented 0.95 percent of the issued and outstanding shares in G&J. Patricia and Calvin Linnemann (the Linnemanns) each reported one-half of the amount they determined to be the value of the Linnemann gifts on a timely filed Form 709. In determining (and reporting) the values of the Patricia Linnemann gifts, the Linnemanns also relied on the Business Valuations report. The total reported value of the Patricia Linnemann gifts was $2,130,000.

## ULTIMATE FINDING OF FACT

On July 31, 1992, the fair market value of a share of stock of G&J representative of the shares constituting both the Walter Gross and Patricia Linnemann gifts was $10,910.

## OPINION

## I. Introduction

On July 31, 1992, Walter Gross and Patricia Linnemann made gifts to their respective children of shares of stock in a corporation, G&J Pepsi-Cola Bottlers, Inc. (G&J). Walter Gross and Patricia Linnemann are members of a family group (the Gross family group) that, in 1992, owned 50 percent of the outstanding shares of stock of G&J. Each child received a number of shares of stock in G&J constituting less than a 1-percent interest in the corporation. The parties disagree as to the fair market value (value) of those gifts. The parties have assumed that each of the shares of stock in question (a G&J share) had the same

value, but have expressed their disagreement over that value. Petitioners argue that, on July 31, 1992 (the gift date), the value of a G&J share was $5,680; respondent argues that it was $10,910.

## II. Code and Regulations

Section 2501 imposes a tax for each calendar year on the transfer of property by gift during such calendar year by individuals. Section 2512 provides that "[i]f the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." The standard for determining the value of a gift for purposes of the gift tax is fair market value, i.e., the price at which the property would change hands between a willing buyer and seller, neither being under any compulsion to buy or sell, and both having knowledge of relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 25.2512-1, Gift Tax Regs. Valuation is an issue of fact, see, e.g., Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990), and petitioners bear the burden of proof, Rule 142(a). We have found that the fair market value of a G&J share was $10,910 on the gift date. We shall explain our reasons for that finding.

- 9 -

III.  Arguments of the Parties

A.  Reliance on Expert Testimony

Both parties rely on expert testimony to establish the value of a G&J share.  Petitioners rely on the expert testimony of David O. McCoy, a business appraiser, who prepared a report valuing the common shares of G&J.  Mr. McCoy was accepted as an expert appraisal witness by the Court, and his report was accepted into evidence as his direct testimony.  Mr. McCoy also prepared a report in rebuttal to respondent's expert witness, which report was accepted into evidence as additional direct testimony.  Petitioners also called Charles A. Wilhoite, an appraiser and valuation expert, who prepared a second report in rebuttal to respondent's expert witness.  Mr. Wilhoite was accepted as an expert on appraisal and valuation methodology by the Court, and his report was accepted into evidence as his direct testimony.  Respondent called Mukesh Bajaj, Ph.D., an appraisal expert, who prepared two reports, one valuing minority interests in G&J as of the gift date, and one in rebuttal to Mr. McCoy's first report.  Dr. Bajaj was accepted as an expert appraisal witness by the Court, and his reports were accepted into evidence as his direct testimony.

The principal disagreements among the parties' expert witnesses are: (1) whether it is appropriate to "tax affect" G&J's earnings in determining the value of a G&J share, (2) the

lack of marketability discount to be applied in valuing a G&J share, and (3) G&J's cost of equity.

We shall describe their testimony with respect to their areas of disagreement.

### B. Mr. McCoy's Testimony

#### 1. Introduction

Mr. McCoy stated that his assignment was "to determine the fair market value of small minority interests in the common stock of G&J". Mr. McCoy used three separate methods to determine that value: market price comparison method, discounted future free cash-flow method, and valuation by capitalization of earnings. Mr. McCoy gave equal weight to the results reached under the second and third methods, but only one-third of that weight to the result reached under the first method. Mr. McCoy determined a weighted average value for a G&J share and, then, applied a discount for lack of marketability to arrive at the aforementioned value for a G&J share of $5,680.

#### 2. Tax Affecting G&J's Earnings

Under the discounted future free cash-flow method, Mr. McCoy considered G&J to be an asset capable of producing cash-flows to its owners for an infinite number of periods. He determined the present value of G&J by, first, hypothesizing the available cash for each such period, second, discounting each such amount to

reflect both the delay in payment and the risk of nonpayment, and third, summing the results.

Mr. McCoy testified that, in 1992, various professional associations published standards governing the conduct of professional business appraisers and that professional appraisers were ethically bound to follow those standards. Specifically, Mr. McCoy specified an appraisal foundation publication entitled the Uniform Standards of Professional Appraisal Practice (USPAP), which required business appraisers to be aware of, to understand, and correctly to employ recognized methods and techniques necessary to produce a credible result (the standards rule). Mr. McCoy further testified that, in order to comply with the standards rule, it was necessary for professional appraisers to "tax affect" the earnings of an S corporation in order to produce a credible business appraisal. To accomplish such tax affecting, Mr. McCoy introduced a fictitious tax burden, equal to an assumed corporate tax rate of 40 percent, which he applied to reduce each future period's earnings, before such earnings were discounted to their present value.[2]

---

[2]    Sec. 11 imposes a tax on the income of every corporation. Additionally, the shareholders of a C corporation, defined in sec. 1361(a)(2) as any corporation which is not an S corporation, must include in gross income any dividends received from the C corporation, sec. 301(c)(1), thus giving rise to the claim that the income of a C corporation is subject to a double tax. Conversely, an S corporation (as defined in sec. 1361(a)(1)),

(continued...)

### 3.  Lack of Marketability Discount

Mr. McCoy examined several studies that considered the lack of marketability of closely held and restricted securities. Mr. McCoy testified that, based on his examination, an average lack of marketability discount for shares that would eventually become freely tradable was "30%+".  Mr. McCoy then concluded that a greater discount was required for the G&J shares because they were illiquid and not marketable.[3]  Mr. McCoy testified that a discount rate of at least 35 percent was required to compensate an owner for the lack of marketability of those shares.

### 4.  Cost of Capital

Mr. McCoy testified that G&J's cost of equity capital was 19 percent.[4]  He explained that G&J compared in size to very

---

[2](...continued)
generally is not subject to the sec. 11 tax.  See sec. 1363(a). Instead, the items of income, loss, deduction, or credit, of the S corporation are passed through to the shareholders of the S corporation and are taken into account directly in computing their tax liabilities.  See sec. 1366(a).  Additionally, in Ohio, S corporations (such as G&J) are not subject to State income tax. See Ohio Rev. Code Ann. sec. 5733.09(B) (Banks-Baldwin 1995).

[3]    Specifically, Mr. McCoy noted that, in addition to being closely held, the G&J shares were restricted as to transferability and were subject to a right of first refusal.

[4]    In his oral testimony, Mr. McCoy distinguished between "nominal" and "real" numbers.  Mr. McCoy testified that the difference was that the effects of inflation, which he opined to be 4 percent, were eliminated from "nominal" numbers to produce "real" numbers.  Mr. McCoy explained that we must add his opined 4-percent inflation rate to his reported cost of equity

(continued...)

small capitalization public companies, which necessitated such a required rate of return.  In addition to his market-derived required rate of return, Mr. McCoy further buttressed his opinion by summing the following component risk factors of G&J's cost of equity capital:  (1) 2.1 percent as the risk-free rate of return, (2) 7 percent as an equity risk premium, (3) 1 percent as an adjustment for company specific risk, and finally (4) 4.8 percent as a small capitalization risk premium.[5]

C.  Dr. Bajaj's Testimony

1.  Introduction

Dr. Bajaj also stated that his assignment was to determine the fair market value of certain minority blocks of stock in G&J. Dr. Bajaj relied principally on a discounted cash-flow approach to determine that value.  To test the validity of his conclusions, he considered the values of companies he thought comparable to G&J.  He also applied a discount for lack of marketability, and he arrived at the aforementioned value for a G&J share of $10,910.

---

[4](...continued)
(15 percent) in order to convert it back to a nominal number for comparative purposes.  He, therefore, agreed that using "nominal" numbers, his calculated cost of equity was 19 percent compared to Dr. Bajaj's calculation of 15.5 percent.

[5]    Although the sum of Mr. McCoy's risk factors is 15 percent, Mr. McCoy added 4 percent to his result in order to convert it to a nominal rate of return for comparison purposes.  See supra note 4.

### 2. Assumption of a Zero-Percent Corporate Tax Rate

Dr. Bajaj knew that G&J was an S corporation on the valuation date, and, based on information that he had received from G&J's management, he assumed that it would remain an S corporation indefinitely. He further assumed that virtually all of G&J's earnings would continue to be distributed to its shareholders. Dr. Bajaj determined that a zero-percent corporate tax rate was an appropriate assumption to make in determining the earnings of G&J available for distribution. Dr. Bajaj also ignored shareholder level taxes in arriving at his discount rate.

### 3. Lack of Marketability Discount

Dr. Bajaj testified that an appropriate discount for lack of marketability applicable to G&J's shares on the valuation date was 25 percent. In arriving at his conclusion, Dr. Bajaj first reviewed various commonly cited published studies that examined marketability discounts. He divided the studies into two categories: (1) studies that analyzed sales of restricted stock by firms that also had publicly traded shares, and (2) studies that compared share prices observed in successful initial public offerings (IPOs). With regard to the first category, Dr. Bajaj concluded that, due to variations in characteristics of the observed firms and transactions, only about 10 to 15 percent of

the observed discounts[6] could be attributed to a lack of marketability.  With regard to the second category, Dr. Bajaj concluded that the published results were not useful in evaluating discount levels for two reasons.  First, Dr. Bajaj testified that many of the pre-IPO private market transactions probably did not occur at fair market value.  Second, Dr. Bajaj testified that examining only a selection of firms that carried out underline successful IPOs was a biased statistical sample, and that such bias would tend to increase the apparent "discount".  Relying more on his own empirical analysis of lack of marketability discounts, and considering such factors as G&J's generous dividend policy and its greater marketability restrictions (i.e., the restrictive transfer agreements), Dr. Bajaj concluded that a conservative estimate of the lack of marketability discount for G&J's shares on the valuation date was 25 percent.

### 4.  Cost of Capital

Dr. Bajaj used a 15.5-percent cost of equity and a 8.25-percent cost of debt to derive a 14.4-percent weighted cost of capital for G&J.  He used the capital asset pricing model to derive his opined cost of equity.  Dr. Bajaj used 7.46 percent as

---

[6]     According to Dr. Bajaj, the studies that analyzed sales of restricted stock by firms that also had publicly traded shares demonstrated that the median discounts ranged from 10 to 40 percent.

the risk-free rate of return,[7] 7.4-percent as the long-term market risk premium,[8] and 1.09 percent as G&J's beta coefficient.[9] Dr. Bajaj's cost of equity calculation was as follows:  7.46 + (1.09 * 7.4) = 15.5 percent.

Dr. Bajaj determined G&J's cost of debt capital by looking at G&J's real borrowing costs.  In April 1991, G&J took on debt in part to fund an expansion.  It borrowed the needed funds at 8.25 percent, which was three-quarters of a percent below the then prime rate of 9 percent.

D.  Petitioners' Motion in Limine

Petitioners have moved to exclude Dr. Bajaj's testimony (the motion).  First, petitioners argue that Dr. Bajaj's opinion as to the fair market value of a minority stock ownership interest in G&J is inadmissible because it was derived from the application of scientifically unreliable methodologies.  See Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 589 (1993)(under the

---

[7]    Dr. Bajaj explained that the yield to maturity on 30-year Treasury securities was an appropriate measure of a risk-free rate, which, according to information published by the Federal Reserve was 7.46 percent as of July 31, 1992.

[8]    Dr. Bajaj explained that the 7.4-percent long-term market risk premium was derived from historical data published by Ibbotson Associates, Inc.

[9]    Dr. Bajaj defined beta as a measure of the tendency of a security's return to move with the overall market's return.  He estimated G&J's beta from the betas for public firms operating in the soft drink industry for which published figures were available.

Federal Rules of Evidence, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but is also reliable). Petitioners further argue that neither Dr. Bajaj's underlying data nor his empirical analysis has been published or otherwise submitted for peer review by the appraisal profession. Finally, petitioners argue that, in part, the data Dr. Bajaj relied upon was not available in 1992, and, therefore, a willing and knowledgeable buyer and seller could not, at that time, be expected to have relied on Dr. Bajaj's marketability discount analysis in arriving at a fair market value determination of G&J's stock. Petitioners cite Estate of Newhouse v. Commissioner, 94 T.C. 193 (1990), and Estate of Mueller v. Commissioner, T.C. Memo. 1992-284, as authority for the proposition that we must reject Dr. Bajaj's new data and empirical analysis as a matter of law. We disagree.

In Daubert v. Merrell Dow Pharm. Inc., supra at 585-587, the Supreme Court held that the "general acceptance" test, the dominant standard for determining the admissibility of novel scientific evidence at trial, was superseded by the adoption of the Federal Rules of Evidence. Fed. R. of Evid. 702 reads:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise.

Pursuant to Fed. R. of Evid. 702, the Court must assure that scientific evidence is not only relevant, but also reliable. Daubert v. Merrell Dow Pharm., Inc., supra at 589. Daubert, however, is not limited to evidence that is scientific only in the laboratory sense. Recently, in Kumho Tire Co. v. Carmichael, 526 U.S. ___, ___, 119 S. Ct. 1167, 1171 (1999), the Supreme Court made clear: "Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Dr. Bajaj's testimony (as well as Mr. McCoy's) was of a technical nature. Therefore, Daubert is applicable here, and we have a gatekeeping role to perform.

As we have said, value is a question of fact. See supra sec. II. Dr. Bajaj has an opinion as to that fact, arrived by applying certain tools of financial analysis, primarily a discounted cash-flow analysis, which is a method of analysis also employed by Mr. McCoy. Petitioners do not claim that a discounted cash-flow analysis is an unreliable tool for determining the present value of one or more future cash-flows (e.g., the distributions of cash Dr. Bajaj assumed G&J would continue indefinitely). We have for many years relied on a

discounted cash-flow analysis to determine the present value of one or more future cash-flows. See, e.g., <u>Plumb v. Commissioner</u>, 7 B.T.A. 295, 297 (1927); <u>Willamette Indus., Inc. v. Commissioner</u>, T.C. Memo. 1990-339 (setting forth the algebraic formula to determine the present value of a future payment). When properly applied, a discounted cash-flow analysis is a reliable tool for financial analysis. The difference in opinions as to value reached by the two expert witnesses, at least to the extent it is attributable to the discounted cash-flow approach, is exclusively the result of differences between them as to the values of certain variables, <u>not</u> a difference as to methodology. Therefore, since we find the discounted cash-flow analysis to be a reliable tool to determine the present value of one or more future cash-flows, we believe that petitioners' argument, to wit, that Dr. Bajaj's opinion is based on unreliable methodologies, is nonsensical.

Because we find that both parties' experts relied on the same acceptable valuation methodology, and that the areas of disagreement between the experts are merely factual disagreements over various factors and assumptions, we need not address further petitioners' second concern, that Dr. Bajaj's "method" has not been subjected to peer review.

Finally, we address petitioners' last contention, that the data Dr. Bajaj relied upon was not available in 1992 and,

therefore, in calculating a discount for lack of marketability a willing buyer and seller could not have relied upon it. Dr. Bajaj's sample consisted of 157 observed transactions from January 1, 1980, to October 31, 1996. Seventy-eight of the transactions preceded the gift date, and 79 were announced subsequent to the gift date. Petitioners' reliance on Estate of Newhouse v. Commissioner, supra, and Estate of Mueller v. Commissioner, supra, is misplaced. In Estate of Newhouse we held: "[t]he focus of a valuation inquiry * * * is on the existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in determining a selling price." Estate of Newhouse v. Commissioner, 94 T.C. at 231. It is not improper, however, to consider later events to the extent that such events may shed light upon a fact, circumstance, or factor as it existed on the valuation date. See, e.g., Estate of Gilford v. Commissioner, 88 T.C. 38, 52-53 (1987). We do not interpret Dr. Bajaj to have opined that a willing buyer and a willing seller would or could have relied upon the data he used on the gift date. Instead, Dr. Bajaj testified that, based on a survey and examination of similar transactions, including transactions that occurred after the gift date, we can determine with reasonable accuracy what willing buyers and willing sellers were doing on the valuation date. Dr. Bajaj testified

> it is methodologically appropriate to use the comprehensive sample I collected to estimate marketability discounts even though approximately half the sample consists of post-valuation date announcements because there is no reason to believe that the underlying economics of private placement would have changed after the valuation date.

We agree.  Further, petitioners have not alleged that the observed lack of marketability discounts in similar private placement transactions would have changed after the valuation date.

Additionally, after performing an identical statistical analysis on only the prevaluation portion of his data sample, Dr. Bajaj reported a predicted discount similar to the discount he predicted using his complete data.[10]  For the foregoing reasons, petitioners' motion will be denied, and an appropriate order will be issued.

IV.  <u>Valuation of the Gift</u>

    1.  <u>Tax Affecting G&J's Earnings</u>

       A.  <u>Introduction</u>

The decision whether to tax affect G&J's projected earnings under the discounted cash-flow approach accounts for the most significant differences between the parties' expert witnesses. In fact, Dr. Bajaj repeated his analysis, substituting a

---

[10]    In fact, the predicted discount associated with the prevaluation data was slightly lower than with the full sample.

40-percent corporate income tax rate for the zero-percent corporate rate he first assumed.  Offsetting for interest payment deductions, Dr. Bajaj calculated that the resulting market capitalization dropped from $286 million to $188 million, a 34-percent reduction, which amount was within 10 percent of the weighted average value ($171,993,000) computed by Mr. McCoy.

Petitioners argue for tax affecting not only on the basis of the testimony of their expert witnesses, but also on the basis that respondent has advocated that adjustment and must be held to it.

B.  Petitioners' Position

Petitioners introduced into evidence two internal documents of the Internal Revenue Service:  (1) a valuation guide for income, estate, and gift taxes (the guide), and (2) an examination technique handbook for estate tax examiners (the handbook).

We read those excerpts as neither requiring tax affecting nor laying the basis for a claim of detrimental reliance.  The guide, in relevant part, reads:

> * * *  [S] corporations are treated similarly to partnerships for tax purposes.  S Corporations lend themselves readily to valuation approaches comparable to those used in valuing closely held corporations. You need only to adjust the earnings from the business to reflect estimated corporate income taxes that would have been payable had the Subchapter S election not been made.

The handbook, in relevant part, reads:

> If you are comparing a Subchapter S Corporation to the stock of similar firms that are publicly traded, the net income of the former must be adjusted for income taxes using the corporate tax rates applicable for each year in question, and certain other items, such as salaries.  These adjustments will avoid distortions when applying industry ratios such as price to earnings.

Both statements lack analytical support, and we refuse to interpret them as establishing respondent's advocacy of tax-affecting as a necessary adjustment to be made in applying the discounted cash-flow analysis to establish the value of an S corporation.

Even if we were to interpret the excerpts as petitioners do, petitioners do not claim that the excerpts have the force of a regulation or ruling, nor have they shown the type of detrimental reliance that might work an equitable estoppel against respondent.  "Equitable estoppel is a judicial doctrine that precludes a party from denying his own acts or representations which induced another to act to his detriment.  Estoppel is applied against the Commissioner with utmost caution and restraint."  Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992) (internal citations and quotation marks omitted).  In any event: "Detrimental reliance on the part of the party seeking to invoke estoppel is a key condition."  Id.  Petitioners have failed to prove that they relied on either the guide or the handbook in any

way. Accordingly, respondent is not estopped from disregarding a fictitious corporate tax when valuing an S corporation.

C. Mr. McCoy's Testimony

Mr. McCoy lists eight costs or tradeoffs shareholders incur as a result of electing to be taxed as an S corporation. The enumerated costs or tradeoffs highlight three areas of concern, which "tax-affecting" is directed to address. First, Mr. McCoy addresses the possibility that, if an S corporation distributes less than all of its income, the actual distributions might be insufficient to cover the shareholders' tax obligations. As a theoretical matter, we do not believe that "tax-affecting" an S corporation's projected earnings is an appropriate measure to offset that potential burden associated with S corporations. In any event, we do not think it is a reasonable assumption that G&J would not make sufficient distributions to cover its shareholders' tax liabilities. G&J had a strong growth record and a history of making cash distributions to shareholders that nearly equaled its entire income. Petitioners have not convinced us that it would be reasonable to assume G&J would not continue this practice.

Second, Mr. McCoy addresses the risk that an S corporation might lose its favorable S corporation status. We might consider an approach that sought to determine the probability of such an occurrence, and which utilized a tax rate equal to the product of

such probability and the corporate tax rate in an effort to quantify that potential loss. We do not, however, think it is reasonable to tax affect an S corporation's projected earnings with an undiscounted corporate tax rate without facts or circumstances sufficient to establish the likelihood that the election would be lost.

Finally, Mr. McCoy argues that S corporations have a great disadvantage in raising capital due to the restrictions of ownership necessary to qualify for the S corporation election. This concern is more appropriately addressed in determining an appropriate cost of capital. In any event, it is not a justification for tax affecting an S corporation's projected earnings under a discounted cash-flow approach. Mr. McCoy has failed to put forward any cognizable argument justifying the merits of tax affecting G&J's projected earnings under a discounted cash-flow approach.

D. <u>Mr. Wilhoite's Testimony</u>

Mr. Wilhoite was asked to address whether, as of the valuation date, it was reasonable for Dr. Bajaj to value a G&J share, using the discounted cash-flow method, while assuming a zero-percent corporate tax rate. Mr. Wilhoite faults Dr. Bajaj for not taking into account the "known payment" of taxes in arriving at a value for the G&J shares. It is unclear, however, whether the "known payment" that Mr. Wilhoite has in mind is the

avoided corporate level tax paid by a C corporation, or the shareholder level tax that results from the flowthrough of tax items to the shareholders of an S corporation.

The clearest argument Mr. Wilhoite put forward explaining why it is appropriate to "tax-affect" an S corporation's earnings is:

> In effect, an S corporation is committed to making distributions to shareholders sufficient to cover individual tax liabilities on allocated S corporation earnings in the same fashion that a C corporation is committed to making tax payments to the Service to cover corporate tax liabilities on reported taxable earnings.  * * *  Whether the outflow is a cash distribution made by an S corporation to satisfy shareholders' tax liabilities, or the direct payment of a tax liability by a C corporation, the decrease in cash experienced by either entity represents a known payment which reduces the availability of cash which could otherwise be used to maintain or expand existing operations.  Such a decrease must be taken into consideration when valuing an entity, whether it is structured as a C corporation or an S Corporation.

Mr. Wilhoite's testimony is not persuasive.  On redirect examination, Mr. Wilhoite stated:  "[Y]ou deduct the taxes that would be paid if the company were structured as a C corporation; and that leaves you with a distributable amount of earnings".  Further, Mr. Wilhoite had the following discussion with the Court:

> Mr. Wilhoite:  We're dealing with a stock of a corporation, G&J.  And G&J is an S corporation.  And G&J has generated significant earnings up until the date of the valuation * * * and all of those earnings have been distributed to the shareholders.

The Court:  Um-hmm.

Mr. Wilhoite:  But every dollar of earnings for G&J, in any particular year, has to go to the IRS. Whether it goes through the shareholders or directly, it has to go to the IRS.

So, what's left above the tax that they're paying to the IRS is the true distribution to the shareholder, and also represents the true available cash that the company can distribute.

It is possible that Mr. Wilhoite is arguing that, in valuing an S corporation, the avoided C corporation tax must be taken into account as a hypothetical expense, in addition to the shareholder level taxes actually imposed on the S corporation's shareholders.  Indeed, that is the position taken by Mr. McCoy. Mr. Wilhoite has failed to convince us, however, that Dr. Bajaj should have applied a hypothetical corporate tax rate in excess of the zero-percent actual corporate tax rate he did apply.  He has not convinced us that such an adjustment is appropriate as a matter of economic theory or that an adjustment equal to a hypothetical corporate tax is an appropriate substitute for certain difficult to quantify disadvantages that he sees attaching to an S corporation election.  We believe that the principal benefit that shareholders expect from an S corporation election is a reduction in the total tax burden imposed on the enterprise.  The owners expect to save money, and we see no reason why that savings ought to be ignored as a matter of course in valuing the S corporation.

Although perhaps less likely, Mr. Wilhoite may believe that, as a matter of proper application of a present value analysis, Dr. Bajaj was required to tax affect G&J's expected distributions on account of the expected tax burden to be borne by its shareholders. Dr. Bajaj assumed that G&J would continue to distribute all of its earnings annually. He made no explicit adjustment for any shareholder level taxes, although, undoubtedly, he knew such taxes would be due. Dr. Bajaj did not, however, ignore shareholder level taxes. He simply disregarded them both in projecting G&J's available cash and in determining the appropriate discount rate. The present value of any future (deferred) cash-flow is a function of three variables: (1) the amount of the cash-flow, (2) the discount rate, and (3) the period of deferral.[11] The discount rate reflects the return, over time, to the investor on the amount invested (commonly expressed as a rate of interest). If, in determining the present value of any future payment, the discount rate is assumed to be an after-shareholder-tax rate of return, then the cash-flow should be reduced ("tax affected") to an after-shareholder-tax amount. If, on the other hand, a preshareholder-tax discount rate is applied, no adjustment for taxes should be made to the

---

[11]    $PV = C/(1+r)^n$, where PV equals the present value, r equals the discount rate, C equals the cash-flow, and n equals the number of periods of deferral.

cash-flow.[12]  Since, in applying his discounted cash-flow approach, Dr. Bajaj assumed a preshareholder-tax discount rate, he made no error in failing to tax affect the expected cash-flow. If Mr. Wilhoite's criticism is based on his assumption that Dr. Bajaj wrongly disregarded shareholder level taxes, then he is in error.

### 2.  Lack of Marketability Discount

We have considered the expert testimony on the lack of marketability issue, and we weigh that testimony in light of the experts' qualifications and other credible evidence.  See Estate of Newhouse v. Commissioner, 94 T.C. at 217.  While we recognize the severity of the restrictions imposed both by law and by and among the existing shareholders, which limited the marketability of G&J's shares in 1992, we find Dr. Bajaj's testimony to be thorough and more persuasive than Mr. McCoy's.  Taking account of the inherently subjective and imprecise nature of the

---

[12]   Thus, assume that, in consideration for today investing $100, an investor is to receive $110 in 1 year.  The interest rate implicit in this example is 10 percent.  Assume that the investor's return will be subject to a 40-percent tax.  If the investor considers that his after-tax return will be $106 and assumes an after-tax discount rate of 6 percent, then the present value of the after-tax cash flow of $106 would be $100.  If, on the other hand, the investor considers that his pretax return will be 10 percent, then the present value of the pretax cash flow of $110 would also be $100.  Hence, there is no difference in result.

investigation,[13] we find that an appropriate lack of marketability discount for the gifted shares on the gift date was 25 percent.

### 3. Cost of Capital

The final significant area of contention between the parties is the appropriate cost of equity capital to be used for purposes of valuing the G&J shares.  Based on the opinions of their respective experts, petitioners and respondent assert G&J's appropriate cost of equity capital was 19 percent and 15.5 percent, respectively.

It is unclear how Mr. McCoy arrived at 19 percent. Mr. McCoy begins by stating:  "The required rate of return is determined by comparison to rates of return on investments of similar risk."  He then ranks various investments by quality, as of December 1991, beginning with long-term Government bonds and ending with the category "extreme risk".  One ranking consists of "CC Bond" and "Very Small Cap. Companies", which shows "Yield to

---

[13]    Both parties criticize the opposing opinion evidence testimony as being arbitrary and unsupported.  Petitioners note that, at first, Dr. Bajaj, in his report, carefully estimated a "conservative" lack of marketability discount of 13 percent. Then, arbitrarily, based on "several additional facts", and with less than half a page of discussion, he "virtually doubles" his estimate and concludes that an appropriate discount is 25 percent.  Respondent, in turn, notes that the Business Valuations report relies on studies which examined biased statistical data, and studies which misinterpret observed results.

Maturity" of "18+". The next higher ranking, "CCC Bond" and "Small Cap. Companies" shows a "Yield to Maturity" of "21+". Mr. McCoy testified that he chose 19 percent because it fell within the range of yields to maturity for very small capitalization companies. He also testified that he checked his conclusion by building up the required rate of return from various factors, including an "Expected Small Stock Risk Premium" of 4.8 percent, the source of which, allegedly, was Stocks, Bonds, Bills and Inflation: 1992 Yearbook, Ibbotson Associates Inc. (1992). It is not clear how Mr. McCoy defines "Very Small Cap. Companies". At trial, Mr. McCoy in fact admitted that G&J did not fall into the Ibbotson definition of a small company. We, therefore, have no confidence in the foundation of Mr. McCoy's analysis on this issue. We are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. See Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). Petitioners have not met their burden of demonstrating that an appropriate cost of equity capital for G&J on the gift date was 19 percent.

We find Dr. Bajaj's testimony to be thorough and convincing. Dr. Bajaj opined a 14.4-percent weighted average cost of capital for G&J as of the valuation date. He used the capital asset pricing model to derive an appropriate cost of equity capital,

and he used G&J's real borrowing costs to derive an appropriate cost of debt capital for G&J as of the valuation date. Indeed, G&J's 8.25-percent borrowing rate in 1991 was three-quarters of a percent below the prime rate. By the valuation date, the prime rate had dropped to 6 percent; therefore we believe that Dr. Bajaj's opinion errs on the generous side, if at all. We accord significant weight to Bajaj's opinion.

Further, the category immediately above "Very Small Cap. Companies" in Mr. McCoy's rankings is entitled "Small Cap. Companies", which, according to McCoy, has a reported required rate of return of 15 percent. That figure is associated with a nominal category that is not inconsistent with petitioners' assertions (that G&J was a "small company"), and it is in harmony with respondent's asserted value. Therefore, we conclude that an appropriate cost of equity capital for G&J on the gift date was 15.5 percent.

V. Conclusion

For the foregoing reasons, we conclude that the value of the gifted shares on the gift date was $10,910 per share.

Decisions will be entered

under Rule 155.